Filed 9/29/17; Certified for Publication 10/26/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY OF WEST HOLLYWOOD, | B270416 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC100392) |
| v. | |
| ANNE KIHAGI et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los
Angeles County, Gerald Rosenberg, Judge.  Affirmed in part
and reversed in part.

NT Law Group, Julie N. Nong; Zfaty│Burns, Isaac R.
Zfaty, Ryan N. Burns and Sam B. Maralan for Defendants
and Appellants.

Michael Jenkins, City Attorney, and Alison G. Regan, Staff Attorney, for Plaintiff and Respondent.

_____

Anne Kihagi, 1263 North Crescent, LLC, and Aquat 009, LLC (collectively Kihagi) appeals the trial court judgment in favor of City of West Hollywood (City) finding that Kihagi violated her settlement agreement with the City and permanently enjoining her from terminating tenancies at 1263–1267-1/2 North Crescent Heights Boulevard in West Hollywood.  The trial court also awarded attorney fees to the City.  We affirm the trial court's determination that Kihagi violated the settlement agreement.  However, because the permanent injunction in its current state is unenforceable, we reverse the trial court's imposition of the injunction.  Given this holding, we also reverse the trial court's attorney fee award.

## BACKGROUND

### A.    The Ellis Act

The Ellis Act prohibits a city or county from "compel[ling] the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease."  (Gov. Code, § 7060, subd. (a).)[1]

Enacted in 1985, the statute was a legislative response to the California Supreme Court decision in *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97.  In *Nash*, a landlord

_____

[1] All further statutory references are to the Government Code unless otherwise indicated.

2

"disenchanted . . . with operating rental housing" wanted to evict his tenants from the rent-controlled apartment building he owned in order to demolish the building and keep the land as an investment.  (*Id*. at p. 101.)  However, a city ordinance prohibited the landlord from evicting his tenants and removing his rental units from the housing market without the proper city-issued removal permit.  (*Id*. at p. 99.)  To secure the permit, the landlord had to show he could no longer earn a reasonable return on his investment.  (*Id*. at p. 101.)  Knowing he could not make the required showing for the permit, the landlord petitioned for a writ of mandate.  (*Ibid*.)  The California Supreme Court denied the writ, concluding the ordinance was reasonably related to the city's legitimate goal of maintaining adequate rental housing.  (*Id*. at p. 109.)

The Ellis Act's express purpose was to supersede *Nash v. City of Santa Monica, supra*, 37 Cal.3d 97, to the extent *Nash* conflicts with the act, in order to permit a residential landlord "to go out of business."  (§§ 7060.7, 7060, subd. (a).)  However, while establishing an owner's right to exit the residential rental business, the act did nothing to "[d]iminish[ ] or enhance[ ] any power in any public entity to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations."  (§ 7060.1, subd. (c).)

In order to prevent abuses by landlords who would falsely remove rent-controlled units from the market and then attempt to return them to the rental market at current

market rates, the Ellis Act uses a three-tiered timeline, during which a landlord who returns previously withdrawn units to the market suffers a penalty for doing so.[2] (§ 7060.2.)  Thus, if the landlord offers the previously withdrawn rental units for rent within two years of their withdrawal, the landlord must offer the unit for rent or lease to the displaced tenant at the previous rental plus any intervening annual adjustments, the landlord is liable to the displaced tenant for actual and exemplary damages, and the landlord may be liable to the local public entity for exemplary damages.  (§ 7060.2, subd. (b).)

If the landlord offers the previously withdrawn rental units for rent within five years of their withdrawal, the landlord must offer the unit for rent or lease to the displaced tenant at the previous rental plus intervening annual adjustments, and the landlord is liable to the displaced tenant for punitive damages (not to exceed six months' rent) for failure to offer the rental to the displaced tenant. (§ 7060.2, subd. (a)(1)-(2)(B), (c).)

If the landlord offers the previously withdrawn rental units for rent within 10 years of their withdrawal, the landlord must offer the unit for rent or lease to the displaced tenant, and the landlord is liable to the displaced tenant for punitive damages (not to exceed six months' rent) for failure

---

[2] The West Hollywood Municipal Code section 17.52.010 (MC 17.52.010) imposes the same penalties outlined in the Ellis Act.

4

to offer the rental to the displaced tenant.  (§ 7060.2, subd. (c).)

   **B.    *Kihagi I*[3]**

   1263 North Crescent LLC owns an eight-unit apartment building at 1263 to 1267-1/2 North Crescent Heights Boulevard in West Hollywood.  Kihagi is the managing member of 1263 North Crescent LLC and Aquat 009 LLC.  The apartment building is subject to the City's Rent Stabilization Ordinance (RSO), West Hollywood Municipal Code section 17.040.010 et seq.

   On July 17, 2008, Kihagi notified the City that the apartment building would be withdrawn from the rental market.  At the time, four of the units were occupied and the other four units were vacant.  (The vacant units were units 1263-1/2, 1265, 1265-1/4, and 1267-1/2.  The occupied units were units 1263, 1265-1/2, 1265-3/4, and 1267.)  Kihagi notified the tenants in the four occupied units that their tenancies would be terminated as of November 14, 2008.

   On August 8, 2008, Kihagi rented one of the vacant units, unit 1263-1/2, to Moshe Stratz (Stratz) for $500 per

---

[3] The following facts are from our unpublished opinion in *City of West Hollywood v. Kihagi* (Jan. 7, 2014, B244072) [2014 WL 47072] (*Kihagi I*) because the relevant facts remain unchanged.  In a second unpublished opinion, *Sheehe v. Kihagi* (July 19, 2016, B259455) [2016 WL 3944580] (*Kihagi II*), we held that our decision in *Kihagi I* did not bar the City from moving for a preliminary injunction enjoining Kihagi from re-renting units at the property pending trial.

month.  Kihagi did not notify the City she was renting the apartment.  When Stratz learned that Kihagi had withdrawn the units from the rental market, he went to the City to get further information.  When Kihagi discovered Stratz had gone to the City, she told him he must move immediately, and if he did not, she would make his life miserable.  As part of her rental agreement with Stratz, Kihagi agreed to pay the utilities; however, Kihagi shut off the electricity in Stratz's unit, obstructed the gas company and electricity company's attempts to turn on the utilities in the apartment, and failed to connect the hot water line to Stratz's apartment.  Kihagi also failed to deliver a lease to Stratz and refused to accept his rent check for October 2008.

On October 23, 2008, the City inspected the unit and discovered there was no electricity or hot water in Stratz's unit, and found unpermitted plumbing work in the bathroom.  The City told Kihagi she needed to restore electricity to the unit immediately, but she refused to do so.  The City issued three citations against Kihagi for failing to properly maintain the unit.

On October 30, 2008, the City filed an action seeking a temporary restraining order and permanent injunction against Kihagi to enjoin Kihagi from further violations of the RSO.  On October 30, 2008, the court issued a temporary restraining order enjoining Kihagi from refusing to restore electricity and hot water to 1263-1/2, performing any plumbing work on the unit, as well as enjoining her termination of the four remaining tenancies.

In January 2009, the City and Kihagi reached a settlement of the matter. The settlement provided that the notice of termination of tenancy would be extended for an additional 90 days from November 14, 2008 for occupied units 1263 and 1265-1/2. In addition, "[t]he vacant or vacated units at the property will not be rented during the notice period or during the period in which restrictions apply under the Ellis provision of the RSO." If Kihagi violated these terms, the City would be entitled to a permanent injunction and $10,000 in liquidated damages. Kihagi would be given no opportunity to cure her breach. The parties agreed that the City would dismiss the complaint, but that the trial court would retain jurisdiction under Code of Civil Procedure section 664.6 in order to enforce the terms of the settlement agreement.

On March 1, 2012, Kihagi notified the City she would be renting units 1263-1/2, 1265, and 1265-1/2. In April 2012, Elisabeth Dillon rented unit 1265 for $1,800 per month; Kihagi told her there were other units in the building for rent. In April 2012, Kihagi rented unit 1263-1/2 to two tenants for $1,895 per month.

On May 16, 2012, the City moved to enforce the settlement agreement, contending that Kihagi had violated the agreement by renting the units during the period in which restrictions applied under the Ellis provisions of the City's RSO. The City sought entry of judgment according to the terms of the settlement agreement, as well as attorney fees. The City argued that the RSO, section 17.52.010,

subdivision (15)(d) contained restrictions that applied to rental units for 10 years after their withdrawal; under those restrictions, Kihagi was prohibited from renting the units until after July 18, 2019.  The City sought to enjoin Kihagi from renting or offering for rent the remaining vacant units at the property until July 18, 2019; charging more than the historic maximum allowable rents (MAR) for units 1263, 1265-1/2, 1265-3/4, and 1267; and failing to offer the former tenants the right of first refusal to return to their units at the MAR in effect at the time of their occupancy.

Kihagi countered that she did not violate the settlement agreement because she did not agree to keep the units off the rental market for 10 years.  Rather, the agreement required her to comply with the Ellis Act, which she had done; further, the settlement agreement could not legally require a 10-year moratorium on renting the units. Kihagi stated that when units 1263-1/2 and 1265 were withdrawn from the market, they were vacant, and "as [those units] were unoccupied, there were no notices of interest to re-rent submitted to me" and further that "as [those units] were vacant when they were withdrawn from the market, there was no maximum allowable rent set." Kihagi stated that units 1263-1/2 and 1265 were being rented at reasonable market rates, and that she did not understand the settlement agreement to prohibit rental of the units for any time during which the Ellis Act imposed any type of regulation.  Kihagi said that if she had

interpreted the settlement agreement in that fashion, she would not have entered into it.

In reply, the City asserted that the agreement's rental restrictions began to apply when the units were withdrawn from the market on July 17, 2009. Further, the settlement agreement reflected the requirements of the Ellis Act, which was to insure that landlords do not evict tenants in order to re-rent the units at higher market rates. As a result, Kihagi was required to first offer the units to the displaced tenants.

The trial court found that Kihagi was in breach of the settlement agreement, and entered judgment enjoining Kihagi "from proceeding with the termination of tenancies at 1263–1267-1/2 N. Crescent Heights Blvd. under the Notice to the City of Intent to Withdraw Rental Units from the Market" filed on July 17, 2008. The trial court further ordered Kihagi to pay the City liquidated damages in the sum of $10,000 as well as the City's attorney fees.

We reversed.

We held that under the terms of the settlement agreement, Kihagi could return units where tenants had been displaced to the rental market as long as she complied with the Ellis Act. The facts established that Kihagi had complied with the Ellis Act and thus was not in breach of the settlement agreement. As noted above, when Kihagi told the City that the eight-unit property would be withdrawn from the rental market, four units were occupied (1263, 1265-1/2, 1265-3/4, and 1267) and four units were vacant (1263-1/2, 1265, 1265-1/4, and 1267-1/2.) More than two years had

9

elapsed when Kihagi sought to return units 1263-1/2, 1265, and 1265-1/2 to the rental market in 2012; thus the Ellis Act's five-year provisions would apply.

However, the units *actually* rented in 2012 (1263-1/2 and 1265) had been voluntarily vacated in 2008, and thus unoccupied, when Kihagi notified the City that the apartment building would be withdrawn from the rental market. Therefore, these two units did not need to be offered to the former tenants or offered at their former rents. With respect to unit 1265-1/2, which was in fact occupied at the time of the notice of withdrawal, Kihagi had not re-rented the unit in 2012, when the City sought enforcement of the settlement agreement. Therefore, Kihagi could not be in breach of the Ellis Act as to this unit because no rental had actually occurred.

## PRESENT APPEAL

### A. Ellis Act Violations

We handed down *Kihagi I* in January 2014. According to the City, Kihagi has now done exactly what we expressly prohibited her from doing—re-rented formerly-occupied units (units 1265-1/2, 1265-3/4, and 1267) without adhering to the Ellis Act. As noted above, the Ellis Act requires an owner to provide the right of first refusal to the former tenant if the unit is re-rented within 10 years of its withdrawal and the tenant has given notice of his or her

10

interest in re-renting the unit.[4]  Here, the property was withdrawn from the rental market on July 17, 2008.[5]  Thus, according to the City, Kihagi was bound by this Ellis Act requirement until July 17, 2019.

Nevertheless, on May 5, 2014, Kihagi returned unit 1265-1/2 to the rental market without offering the displaced tenant (John Sheehe) the right of first refusal to return to the unit.  On November 1, 2014, Kihagi returned unit 1267 to the rental market without offering the displaced tenant (Kevin King) the right of first refusal to return to the unit. On May 1, 2015, Kihagi returned unit 1265-3/4 to the rental market without offering the displaced tenant (Hugh Faulkner) the right of first refusal to return to the unit. Because all three tenants notified Kihagi of their interest in re-renting the units but were not offered the opportunity to do so, Kihagi was in breach of the settlement agreement.

---

[4] If the landlord fails to offer the rental to the displaced tenant, the landlord is then liable to that tenant for exemplary damages (not to exceed six months' rent). (§ 7060.2, subd. (c).)

[5] According to the settlement agreement, the units were withdrawn from the market on July 17, 2008. However, the last tenant (who occupied unit 1267) did not vacate his unit until July 17, 2009.  According to the City, this renders July 17, 2009 as the withdrawal date for *all* of the units.  Kihagi counters that the July 17, 2009 withdrawal date applies *only* to unit 1267.  As discussed below, we agree with Kihagi on this point.

11

On November 20, 2015, the City filed a motion to enforce the settlement agreement. On December 31, 2015, the trial court found that Kihagi had violated the terms of the settlement agreement and entered judgment in favor of the City. The trial court permanently enjoined "Kihagi, their agents, representatives, successors, assigns, and all those acting in concert with them . . . from proceeding with the termination of tenancies at 1263–1267-1/2 N. Crescent Heights Blvd. under the Notice to the City of Intent to Withdraw Rental Units from the Market" filed on July 17, 2008.[6] The court also ordered Kihagi pay the City $10,000 in liquidated damages as well as the City's attorney fees in bringing the motion.

Kihagi does not contest the facts on appeal, conceding there is "no dispute" the three units were re-rented. Instead, Kihagi posits a purely legal argument, claiming the settlement agreement bars her from re-renting the units for 10 years, an unenforceable prohibition in direct contradiction of the Ellis Act. As noted by the City, this is the precise argument Kihagi raised in *Kihagi I*. We addressed this claim in *Kihagi I*, holding that the agreement did not in fact bar Kihagi from re-entering the rental market. Rather, Kihagi could return formerly-occupied

_____

[6] Kihagi contends that this permanent injunction "leads to a legal impossibility and an absurd result" given that the three tenancies at issue had been terminated as of 2009.

units to the rental market as long as she complied with the Ellis Act.

The present appeal simply applies the same legal argument made in *Kihagi I* to three units that had yet to be re-rented at that time. However, our holding in *Kihagi I* remains binding. Indeed, the "law of the case" doctrine dictates that an appellate court's holding, on a rule of law necessary to an opinion, must be adhered to throughout the case's subsequent progress in the trial court and on subsequent appeal, as to questions of law (though not as to questions of fact). (*Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, 213.) Thus, we cannot interpret the settlement agreement once again. Furthermore, because Kihagi does not dispute she re-rented the three units, she has waived any argument that the trial court's findings were not supported by substantial evidence.[7] (See *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 427–428.)

Nevertheless, at oral argument, we asked the parties how Kihagi could be permanently enjoined from proceeding with the termination of the tenancies when doing so would

---

[7] Kihagi also contends that the City cannot invoke the former tenants' rights under the Ellis Act when there is no statutory provision allowing the City do so. Since these tenants are not before this court, Kihagi argues, the City lacks standing to assert claims on their behalf. However, it is the settlement agreement that is at issue here. The City is a party to that agreement and thus has standing to enforce its terms.

unfairly displace the units' current tenants. We also asked how the rental rate would be determined if the units were offered to the units' former tenants given that several years had passed since their displacement.

At argument, the parties crafted a joint stipulation seemingly agreeable to both sides—"Should units 1265-1/2, 1265-3/4, and 1267 be vacated voluntarily before July 17, 2019, Kihagi will notify the former tenants Sheehe, Faulkner and King, within 7 days of a vacancy by written notice to the City of West Hollywood. The former tenants will have 30 days to accept the offer. If accepted, the rental rate will be negotiated by the parties to the agreement and the former tenant."

In postargument briefing, however, Kihagi argues that the permanent injunction is "fatally defective and cannot be revived by simply making some adjustments." The City now concedes that the permanent injunction as currently worded in the judgment should be stricken. According to the City, the injunction "cannot be rescued at this stage" and we "need not fashion any language to substitute for the existing wording." We construe Kihagi's argument, and the City's subsequent concession, to mean both parties have now abandoned the joint stipulation drafted and agreed to during oral argument before the appellate court.

We agree with the parties that the injunction in its current state is unenforceable and thus ineffectual. At this stage, we decline to draft a permanent injunction for the parties. Rather, the parties may, if they so choose, return to

14

the trial court for a determination of the appropriate language, guided, as always, by the Ellis Act.

Citing *Embassy LLC v. City of Santa Monica* (2010) 185 Cal.App.4th 771, 777 (*Embassy*), our colleague's dissent observes that public entities cannot avoid the Ellis Act's prohibitions by acting through contract, rather than through regulation.  Thus, a property owner's purported contractual waiver of rights under the Ellis Act is unenforceable. (Conc. & dis. *post*, at p. 4.)  At the outset, we note that our instant opinion holds that the parties must adhere to the Ellis Act.  Indeed, every opinion we have issued in this case has so held.  Thus, in accordance with *Embassy*, we have repeatedly made clear that a contractual waiver of the Ellis Act's requirements is unenforceable.

However, we must note that *Embassy*, *supra*, 185 Cal.App.4th 771 is factually distinguishable from the instant case and inapposite.  In *Embassy*, the parties entered into a settlement agreement that expressly and quite deliberately waived the Ellis Act's requirements.  (*Id.* at p. 774.) Conversely, the parties in this case entered into an agreement that explicitly mandated compliance with the Ellis Act.  Thus, to the extent our colleague reads *Embassy* as prohibiting parties from resolving disputes by entering into settlement agreements, that reading is overbroad.

Continuing to read *Embassy*, *supra*, 185 Cal.App.4th 771 too broadly, the dissent next contends that the foregoing preemption analysis applies equally to the trial court's award of liquidated damages and attorney fees.  (Conc. &

15

dis. *post*, at p. 5.)  Under the settlement agreement, if Kihagi violated the terms of the agreement, the City would be entitled to $10,000 in liquidated damages as compensation for the breach.  Yet, under the Ellis Act, the City could potentially receive exemplary damages if Kihagi offered the previously withdrawn rental units for rent within two years of their withdrawal.  (See § 7060.2, subd. (b).)  As discussed below, we have now determined that Kihagi offered the units within 10 years of their withdrawal, not two.  However, nothing within the Ellis Act prevents a public entity from seeking further relief in the form of compensatory damages in addition to the potential punitive damages offered under the statute.  Nor does the Ellis Act prohibit a public entity from seeking attorney fees.  Indeed, no case has discussed such a sweeping proposition and our colleague does not cite one.  Furthermore, under Code of Civil Procedure section 1021, unless attorney fees are specifically provided for by statute—which they are *not* here—"the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs."

With respect to rental rates, the City argues that Kihagi should be able to charge no more for those units than the rent in place on the date the tenants were evicted.  We reject this argument.  Unit 1265-1/2 was returned to the market on May 5, 2014, while unit 1267 was returned to the market on November 1, 2014, and unit 1265-3/4 was returned to the market on May 1, 2015.  Assuming for the

16

sake of argument that all three units were withdrawn from the market on July 17, 2009, Kihagi returned unit 1265-1/2 to the market four years and nine months after it was withdrawn, while she returned unit 1267 to the market five years and three months after it was withdrawn, and returned unit 1265-3/4 to the market five years and nine months after it was withdrawn.

Thus, under the Ellis Act, Kihagi would have to offer unit 1265-1/2 to the displaced tenant at the previous rental rate plus intervening annual adjustments.  She would also be liable to the displaced tenant for exemplary damages (not to exceed six months' rent) for failure to offer the rental to the displaced tenant.  (See § 7060.2, subd. (a)(1), (c).)  With respect to units 1267 and 1265-3/4, however, Kihagi would only have to offer the units for rent or lease to the displaced tenants.  She would *not* have to offer the units to these tenants at the previous rental rate.  She would also be liable to the displaced tenants for exemplary damages (not to exceed six months' rent) for failure to offer the rental to the displaced tenant.  (See § 7060.2, subd. (a)(1), (c).)

In her supplemental brief, Kihagi concedes that the date of withdrawal for unit 1267 was July 17, 2009.  However, Kihagi argues, the date of withdrawal for units 1265-1/2 and1265-3/4 was actually November 14, 2008, not July 17, 2009.  Thus, according to Kihagi, unit 1265-1/2 was returned to the market five years and five months after it was withdrawn, while unit 1265-3/4 was returned to the market six years and five months after it was withdrawn.

17

Whether we adopt the November 14, 2008 withdrawal date or the July 17, 2009 withdrawal date, unit 1265-3/4 was returned to the market more than five years after it was withdrawn.

With respect to unit 1265-1/2, we agree with Kihagi that section 7060.4, subdivision (b), controls in this instance. Under this section, "the date on which the accommodations are withdrawn from rent or lease . . . is 120 days from the delivery in person or by first-class mail of that notice to the public entity." Because Kihagi provided notice on July 17, 2008, unit 1265-1/2 would have been deemed withdrawn from the market on November 14, 2008. The withdrawal date is extended by a year only if the tenant is at least 62 or disabled, and has lived in the apartment for at least one year before the landlord provided notice of intent to withdraw. (See § 7060.4, subd. (b).) It is undisputed that only unit 1267 fell under this exception.

Thus, Kihagi offered units 1265-1/2, 1265-3/4 and 1267 for rent within 10 years of their withdrawal. As a result, Kihagi must offer the previously withdrawn units for rent or lease to the displaced tenants.[8] (See § 7060.2, subd. (c).) However, Kihagi does not have to offer the units at their previous rental rates. (See § 7060.2, subd. (a)(1)-(2)(B).)

---

[8] Punitive damages for failure to offer the rental to the displaced tenants are not at issue here because the tenants are not plaintiffs in this case. (See § 7060.2, subd. (c).)

18

## B.    Attorney Fees

With respect to attorney fees, the parties' settlement agreement provides that:  "Except as set forth in this agreement, if any litigation or arbitration claim concerning any controversy, claim, or dispute between the parties arises out of, or in relation to, this settlement agreement or its interpretation, the prevailing party shall be entitled to recover from the other party its reasonable expenses and costs, including attorney's fees, incurred in conjunction therewith or in the enforcement or collection of any judgment or award rendered therein.  The 'prevailing party' means the party determined by the court to have prevailed, even if that party did not prevail in all matters, not necessarily the party in whose favor a judgment or award is rendered."

Kihagi contends that because she prevailed in a single, discrete "dispute or controversy" during the course of the litigation, she is thus entitled to an award of fees and costs under the terms of the settlement agreement.  Kihagi is incorrect.

The City initially filed its motion to enforce the settlement agreement on or about September 4, 2014.  The trial court entered judgment in favor of the City on November 6, 2014.  However, on June 11, 2015, the trial court found Kihagi had not been properly served with the City's motion to enforce the settlement agreement and granted Kihagi's motion to set aside the judgment.  The City simultaneously informed Kihagi that it would be re-filing its

19

motion to enforce the settlement agreement. Nevertheless, on July 22, 2015, Kihagi filed a motion for an award of attorney fees in connection with the motion to set aside the judgment. The City again informed Kihagi that it planned to re-file its motion to enforce the settlement agreement and requested that Kihagi take her motion for attorney fees off calendar because it was premature. Kihagi ignored the request. At a status conference on August 11, 2015, the City again requested that Kihagi take the motion for attorney fees off calendar since the merits of the motion to enforce the settlement agreement had not yet been heard. Kihagi refused to do so.

On November 20, 2015, the City re-filed its motion to enforce the settlement agreement. On December 15, 2015, the City filed its opposition to Kihagi's motion for attorney fees. In its opposition, the City noted that a hearing on the merits of the motion to enforce the settlement agreement was still pending and that until then, there is no "prevailing party" as that term is used in the settlement agreement and Civil Code section 1717.**9** The term "prevailing party" refers

---

**9** Civil Code section 1717, subdivision (a) provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded . . . to the prevailing party, then the party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs." Under subdivision (b)(1) of the statute, "the party prevailing on the contract" is the party who recovered "a greater relief" in the

to the party who ultimately prevails in the litigation on the contract, not in any single hearing within the litigation, the City argued. "[S]uch an interpretation as Kihagi espouses would wreak havoc with our judicial system and result in multiple motions on every conceivable subject within the litigation to subject each party to endless motions for attorneys' fees." Kihagi filed a reply to the City's opposition on December 30, 2015.

On December 31, 2015, the trial court again entered judgment in favor of the City. The judgment included a permanent injunction and liquidated damages in the sum of $10,000 against Kihagi as well as the City's attorney fees in bringing the motion. On January 7, 2016, the trial court denied Kihagi's motion for attorney fees in connection with the motion to set aside the judgment. "[T]he settlement agreement provides for attorney's fees to the prevailing party in 'litigation' involving a controversy over the settlement agreement," the court observed. "[Kihagi] did not prevail in this litigation."

A trial court's determination as to which party has prevailed " 'will not be disturbed on appeal absent a clear abuse of discretion.' " (*Smith v. Krueger* (1983) 150 Cal.App.3d 752, 756–757.) Under Civil Code section 1717, subdivision (b)(1), a prevailing party is defined as "the party

___

action on the contract. Parties to a contract cannot enforce a definition of "prevailing party" different from that provided in section 1717. (*Walker v. Ticor Title Co. of California* (2012) 204 Cal.App.4th 363, 373.)

21

who recovered a greater relief in the action on the contract." The parties are bound by this definition. (*Walker v. Ticor Title Co. of California, supra,* 204 Cal.App.4th at p. 373.)

Furthermore, fees under section 1717 are awarded to the party who prevailed on the contract overall, not to a party who prevailed only at an interim procedural step. (*Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, 546 [denying fees for prevailing on interim motion that did not resolve substantive dispute]; accord, *Presley of Southern California v. Whelan* (1983) 146 Cal.App.3d 959, 961 [reversing fee award because overall victor "is yet to be determined"]; *Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 [prevailing party determination to be made by comparing parties' degrees of success "upon final resolution" of claims]; *Estate of Drummond* (2007) 149 Cal.App.4th 46, 53 [defendants' fees denied because dismissal of plaintiff's petition "merely deflected or forestalled" plaintiff's claims].)

We recognize, of course, that a defendant might prevail within the meaning of section 1717 by winning a purely procedural dismissal. If re-filing would be legally barred— by the statute of limitations, for example—or would be otherwise impossible or impracticable, the defendant might be deemed the prevailing party without obtaining a resolution on the merits. (*Estate of Drummond, supra,* 149 Cal.App.4th at p. 53.) Indeed, the California Supreme Court recently held that section 1717 does not require a victory on the merits of the contractual dispute, as opposed to a victory

22

on procedural grounds.  (*DisputeSuite, LLC v. Scoreinc.com* (2017) 2 Cal.5th 968, 989.)  But it does require a victory.  Here, as in *Estate of Drummond*, the dismissal of the plaintiff's action was not dispositive.  It did not defeat the City's contract claims, but instead merely deflected or forestalled them.  Indeed, Kihagi was well aware of this fact when filing her motion for attorney fees.  Kihagi's interim victory did not make her the prevailing party under section 1717, and the trial court therefore acted within its discretion in denying Kihagi's motion for attorney fees.

Based on the trial court's judgment, the City was unequivocally the prevailing party and entitled to recover attorney fees.  (See *Hsu v. Abbara, supra*, 9 Cal.4th at p. 876.)  Because the injunction is reversed, however, the City has received, at most, only a part of the relief it sought.  In this situation, the court has discretion to find that the City is not a prevailing party.  (*Id.* at p. 875.)  In exercising its discretion, the court must "compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.  The prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.' "  (*Id.* at p. 876.)  Thus, after remand and upon motion, the trial court should exercise its discretion and determine once again which party is entitled to recover attorney fees.

## DISPOSITION

The trial court's determination that Kihagi violated the settlement agreement is affirmed. However, we reverse the trial court's imposition of a permanent injunction. Should the parties seek to draft a new injunction, they may return to the trial court to do so. Given this holding, we also reverse the trial court's attorney fee award. The trial court should exercise its discretion and determine once again which party is entitled to recover attorney fees. The parties are to bear their own costs on appeal.

JOHNSON, J.

I concur:

CHANEY, J.

ROTHSCHILD, P. J., concurring and dissenting:

I concur in the majority opinion to the extent that it reverses the trial court's injunction and the award of attorney fees. As the majority stated and the parties concede, the trial court's injunction is unenforceable. (Maj. opn. *ante*, at p. 14.) I write separately to explain, among other points, that the defect in the injunction is not merely a matter of how it is currently phrased; specifically, injunctive relief is preempted by the Ellis Act. For the same reason, the orders to pay liquidated damages and attorney fees are also improper.

As the majority holds, the trial court's injunction must be reversed because it is "unenforceable and thus ineffectual." (Maj. opn. *ante*, at p. 14.) Indeed, the injunction is contrary to the general rule that an injunction will not be issued to prohibit a completed act. (See *Griffith v. Dept. of Public Works* (1959) 52 Cal.2d 848, 853; see 6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 350, p. 293.) Because the tenancies whose terminations were to be prevented by the injunction were terminated long before the trial court issued the injunction, it was error to issue the injunction.

The majority states in the disposition that the parties "may return to the trial court" "to draft a new injunction." (Maj. opn. *ante*, at p. 24.) I decline to join in this statement because it is unclear what, if any, rights and obligations it creates or what, if any, authority it grants to the trial court. To the extent that it implies a duty by any party to

participate in the drafting of an injunction or that the trial court has the authority to issue a new or different injunction, I dissent for the following reasons.

First, the basis for an injunction in this instance is the parties' settlement agreement, which the City sought to enforce under Code of Civil Procedure section 664.6. That agreement set forth the precise terms of the injunction to be issued upon the defendants' breach of the agreement, and I agree with the majority that such terms are unenforceable. The trial court cannot, however, impose any other injunction because, when granting a motion to enforce a settlement, the trial court may only enforce the terms of the parties' settlement; it may not "*create* the material terms of a settlement." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810; see generally Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2017) ¶ 12:979.1, p. 12(II)-133.) Therefore, the trial court cannot impose the injunction the parties agreed upon because it is unenforceable, and it cannot impose a different injunction because the parties have not agreed to a different one.

Second, as defendants contend, the Legislature has occupied the field with respect to remedies for violations of the Ellis Act, and to the extent the judgment imposes additional remedies it is preempted by that law.

" 'Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are

2

covered by state legislation ceases as far as local legislation is concerned.' [Citations.]" (*American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1253.) Thus, a public entity may not impose a requirement that "conflicts with general laws either directly or by entering a field which general laws are intended to occupy." (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 141.) When a legislative scheme preempts local legislation in the occupied field, the preemptive reach extends to all "phases of the subject" covered by the state legislation, including a local entity's enforcement mechanisms and remedies. (See, e.g., *American Financial Services Assn. v. City of Oakland*, *supra*, 34 Cal.4th at pp. 1253, 1256-1258.)

Courts have repeatedly held that the Ellis Act preempts local efforts to regulate a landowner's withdrawal of rental units from the market. (See, e.g., *City of Santa Monica v. Yarmark* (1988) 203 Cal.App.3d 153, 167; *Coyne v. City and County of San Francisco* (2017) 9 Cal.App.5th 1215, 1218, 1224-1225; *Johnson v. City and County of San Francisco* (2006) 137 Cal.App.4th 7, 18; *Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1102.) In addition to preserving a landowner's right to withdraw rental units from the housing market, the Ellis Act establishes the remedies available to displaced tenants and public entities when a landowner offers units for rent that had been previously withdrawn. (Gov. Code, § 7060.2.) A displaced tenant may, for example, recover actual and exemplary damages—and a public entity can recover

3

exemplary damages—if the landowner offers the withdrawn unit for rent within two years after it was withdrawn. (Gov. Code, § 7060.2, subd. (b)(1).) If the landowner offers a withdrawn unit for rent more than two years, but fewer than 10 years, after it was withdrawn and fails to first offer the unit to the displaced tenant, the displaced tenant may recover punitive damages in an amount not to exceed six months of the "contract rent." (Gov. Code, § 7060, subd. (c).) The comprehensive and detailed scheme does not provide any remedy for a public entity after a unit has been withdrawn for more than two years, and grants no right to injunctive relief by anyone under any scenario.

Significantly, although the Legislature expressly authorized public entities to enact ordinances regulating the rental of previously withdrawn units, it required that any such ordinance be "subject to" the Ellis Act's statutory limits. (Gov. Code, § 7060.2.) Thus, the Legislature ensured that landowners would be exposed to monetary consequences for prematurely reintroducing withdrawn units to the market or failing to first offer the units to the displaced tenants, but would not be exposed to the risk that a local public entity could enjoin them from renting the units to others.

In light of the comprehensive scheme establishing remedies when a landowner returns withdrawn rental units to the market and the Legislature's requirement that any local ordinance concerning such activity be subject to the Ellis Act's provisions, the Ellis Act has fully occupied the field concerning such remedies and thereby preempts the

City's attempt to impose more onerous and burdensome remedies.

Although the Ellis Act is expressly directed at actions public entities take by "statute, ordinance, regulation, or administrative action" (Gov. Code, § 7060, subd. (a)), it also applies to public contracts. (*Embassy LLC v. City of Santa Monica* (2010) 185 Cal.App.4th 771, 777 (*Embassy*).) As Division Five of this court explains, public entities "cannot avoid [the Ellis Act's] prohibitions by acting through contract, rather than through regulation." (*Id.* at p. 776.) Thus, a landowner's purported contractual waiver of its rights under the Ellis Act is unenforceable. (*Id.* at p. 773.)

I do not suggest that a trial court may never enjoin activity concerning property subject to the Ellis Act. Another division of this court, for example, has held that a trial court could enjoin tenant evictions that would have otherwise been permitted under the Ellis Act when the injunction was necessary to compel compliance with the California Environmental Quality Act (CEQA). (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 454.) This holding was based in part on the Legislature's statement that the Ellis Act was "not intended to '[p]reempt local or municipal environmental or land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property.' " (*Id.* at p. 443, quoting Gov. Code, § 7060.7, subd. (b).) The injunction in this case, however, is unrelated to the

enforcement of CEQA or to any local land use or environmental regulation.

The forgoing preemption analysis applies equally to the trial court's award of liquidated damages and attorney fees. Although the Ellis Act permits a public entity to recover punitive damages when a landlord offers a rental unit for rent within two years after the unit was withdrawn (Gov. Code, § 7060, subd. (b)(2)), a public entity has no right to any remedy when, as here, the units have been withdrawn after more than two years. Nor does the Ellis Act provide for the recovery of attorney fees by any party. Because the City cannot avoid the Ellis Act's limits by contracting around them (*Embassy*, *supra*, 185 Cal.App.4th at p. 776), it cannot recover damages or attorney fees that are not permitted by the statute. Therefore, I would also reverse the award of liquidated damages and, although I agree with the majority that the attorney fee award must be reversed, I disagree that the trial court should hold a further hearing on the right to fees.

ROTHSCHILD, P. J.

6

Filed 10/26/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY OF WEST HOLLYWOOD, | B270416 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC100392) |
| v. | |
| ANNE KIHAGI et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Appellants. | |

THE COURT*:

Upon reconsideration of the request to publish the September 29, 2017 opinion and with good cause now appearing, it is ordered that the opinion in the above entitled matter, filed September 29, 2017, be published in the official reports. The memorandum regarding publication sent to the California Supreme Court on October 24, 2017 is hereby vacated and stricken from the record.

_____
JOHNSON, J.