Filed 6/21/21  Douglas v. Edwards CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KATHLEEN DOUGLAS et al., | D077042 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2011-00066704-CU-OR-EC) |
| WHITNEY EDWARDS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Andrew Rauch and Andrew K. Rauch for Plaintiffs and Appellants.

Kessler & Seecof, Daniel J. Kessler and Benjamin R. Seecof for Defendant and Respondent.

I.

INTRODUCTION

Plaintiffs Scott Douglas, Lisa Douglas and Kathleen Douglas (the Douglases) appeal from a judgment of the trial court entered at the conclusion of a bifurcated trial.  The parties' claims against each other arise from a dispute over real property that they purchased together in 2002.

In the first phase of the bifurcated trial, the trial court adjudicated the Douglases' equitable claims against Edwards and determined that in order to equalize the parties' capital accounts, the Douglases would have to pay Edwards $112,472.80. The trial court entered an interlocutory judgment with respect to those claims, setting forth the court's findings but not awarding damages. An appeal and cross-appeal from the trial court's interlocutory judgment followed. This court affirmed the trial court's interlocutory judgment in *Douglas v. Edwards* (Apr. 23, 2015, D064389) 2015 WL 1870088 [nonpub. opn.] (*Douglas I*). After the remittitur was issued, the parties continued to litigate the Douglases' remaining legal claims, as well as Edwards's cross-claims against the Douglases. Eventually, a second-phase jury trial was held on the remaining claims. The jury found in favor of Edwards on all of the Douglases' claims against her, and also found in favor of Edwards on her claims against the Douglases, concluding that the Douglases committed negligence, fraud, and breach of fiduciary duty. The jury awarded Edwards $112,472.80 in damages on her claims—the amount that Edwards's attorney asked the jury to award, and the same amount the trial court had determined, in the equitable phase of the trial, would be necessary to equalize the parties' capital accounts.[1]

The trial court entered a judgment in favor of Edwards and against the Douglases in the amount of $112,472.80. Edwards subsequently sought prejudgment interest in the amount of $50,797.35, which the trial court awarded.

---

[1] In the equitable phase, the trial court concluded that the parties had not entered into a partnership, but rather, that the nature of their relationship vis-à-vis the Property was " 'most akin to a joint venture.' " (*Douglas I, supra*, 2015 WL 1870088 at p. *3.)

2

On appeal, the Douglases raise a number of challenges to the trial court's judgment. They also contend that the court erred in awarding prejudgment interest. We conclude that the Douglases' contentions are without merit and affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*[2]

Scott and Lisa Douglas are husband and wife. Kathleen Douglas is Scott's mother.[3] Whitney Edwards met Lisa in 1997, prior to Lisa and Scott's marriage. Edwards and Lisa were both interested in animals, and they regularly rode horses together.

In 2000 or 2001, Scott, Lisa, and Edwards began discussing the possibility of purchasing property together. They wanted to purchase at least five acres, which they would use to board and train horses and dogs. In 2002, Scott, Lisa, Kathleen and Edwards purchased an undeveloped 10–acre parcel in Ramona (the Property) for $181,400. Scott and Lisa paid the down payment of approximately $60,000, and Edwards agreed to make the bulk of the monthly mortgage payments. Kathleen was involved in the purchase because she was able to help the group obtain financing. The parties took title to the Property as tenants in common, with Scott and Lisa owning an undivided one-fourth interest, Kathleen owning an undivided one-fourth interest, and Edwards owning an undivided one-half interest.

---

[2] We take many of the background facts underlying the parties' claims from our prior opinion in this matter, *Douglas I, supra*, 2015 WL 1870088 at pp. *1–*2.

[3] We use the Douglases' first names for purposes of clarity.

3

Scott, Lisa and Edwards agreed that the cost of any home construction would be borne solely by the party who planned to live in that home. However, the three agreed to share equally the costs of certain infrastructure improvements to the land, such as the installation of a well, a pump, and pasture fencing. The parties did not memorialize their agreement in writing.

For some period of time, Scott, Lisa, and their children lived on the Property in a recreational vehicle while their house was being built. They paid for the construction of the home, in part, with money from a mortgage that Kathleen had taken out on her home. The home that Scott and Lisa built was completed in 2006.

In September 2006, the parties refinanced their original 20-year mortgage with a new $417,000 loan from Virtual Bank; the loan had a 30-year term, and payments were interest-only for the first 10 years. Some of the proceeds from the new loan were used to pay off the original loan. The remaining balance, $277,583.72, was wired to Scott and Lisa's personal bank account. Scott and Lisa used a large portion of the $277,583.72 to repay Kathleen the money that she had loaned them to build their house on the Property. None of the proceeds from the loan went to Edwards.

Scott informed Edwards that the loan refinance had closed and sent her a document titled, "Closing Statement." The document that Scott sent to Edwards appeared to be a lender-prepared closing statement, and Edwards understood it to be the actual closing statement for the refinance. However, Scott had prepared this document himself; he acknowledged that he designed the document to look like an actual closing statement. The document did not include any reference to the $277,583.72 in cash that Scott and Lisa obtained through the new loan. Edwards testified that Scott also provided her with an amortization schedule that made it appear that payments she made to the

4

Douglases for the mortgage would be paying down principal, when in fact, the refinance loan that the Douglases obtained was an interest only loan for the first 10 years.

Within a year of the refinance, Lisa and Edwards's friendship deteriorated. The parties discussed Scott and Lisa buying out Edwards's interest in the Property, but they could not agree on terms. Ultimately, in April 2009, Edwards stopped making the monthly mortgage payments. At that time, Lisa and Scott took over the mortgage payments and continued to live in the home that they had built on the Property.

B. *Procedural background*

1. *Proceedings leading to the first appeal in this action*

In March 2011, Kathleen, Scott and Lisa sued Edwards. Their operative second amended complaint (the complaint) asserted 13 legal and equitable claims, including a claim for partition of the Property by sale, but "[o]nly in the event that other alternatives fail to achieve a resolution to this matter. . . ."[4] The trial court sustained, with prejudice, Edwards's demurrer to the Douglases' quiet title, constructive trust, and rescission causes of action.

Edwards filed a cross-complaint against the Douglases, asserting causes of action for ouster, fraud, breach of fiduciary duty, constructive fraud, and negligence. In her operative first amended answer to the complaint, Edwards "agree[d] that partition by sale is the only equitable method of partition," and demanded "that the property be partitioned by sale as soon as

_____

[4] A full list of the causes of action that the Douglases asserted in the complaint includes: quiet title to real property, declaratory relief, breach of partnership agreement, breach of fiduciary duty, partnership accounting, partnership dissolution, constructive trust, breach of contract, specific performance, promissory estoppel, rescission, negligent misrepresentation, and partition by sale.

possible in that defendant has been ousted from the property by the plaintiffs and there is no possibility that defendant and plaintiffs can peacefully continue to own the property as cotenants."

The trial court granted Edwards's motion in limine to bifurcate the parties' legal and equitable claims. The court ruled that it would try the Douglases' equitable claims—partnership accounting, partnership dissolution, specific performance, and partition—in the first phase of trial, and that the remaining claims would be tried to a jury in the second phase.

The trial court tried the equitable claims in November and December 2012 and issued its statement of decision in April 2013. During this first phase of the trial, the court considered and ultimately accepted the testimony of Edwards's accounting expert, Mark Boyer, regarding the parties' capital account balances.[5] With respect to the nature of the parties' relationship, the trial court rejected the Douglases' claim that a partnership had been formed and also rejected Edwards's claim that the parties were mere cotenants, finding instead that the endeavor between the parties was " 'most akin to a joint venture.' " (*Douglas I, supra*, 2015 WL 1870088 at p. *3.)

As to disposition of the Property, the trial court found that partition by sale was the appropriate remedy. However, acting in equity, the trial court awarded the Douglases "the first right to purchase" Edwards's interest in the Property for $112,472.80, which the court described as "the amount necessary

---

5    As we explained in *Douglas I, supra*, 2015 WL 1870088 at p. *9, Boyer testified that he assumed a 50/50 partnership between the Douglases and Edwards, with the Property—including improvements to the land, but excluding the Douglases' house—as the partnership's only asset. Boyer calculated the joint venture's expenses and the parties' respective capital contributions, taking into consideration the $277,583.72 that the Douglases received from the $417,000 mortgage refinance. Based on Boyer's calculations, the trial court determined that the Douglases would have to pay Edwards $112,472.80 to equalize the parties' capital accounts. (*Ibid.*)

to equalize the capital accounts" between the parties "as joint venturers." The court further ordered that if the Douglases did not notify Edwards of their intent to exercise the right to purchase her interest in the Property within 30 days of entry of an interlocutory judgment, the property would be sold "in accordance with [Code of Civil Procedure section] 873.820," which specifies the manner in which the proceeds of a partition sale shall be distributed.

The trial court entered an "Interlocutory Judgment For Partition" consistent with its statement of decision. Both the Douglases and Edwards appealed from the interlocutory judgment.

This court affirmed the trial court's interlocutory judgment in *Douglas I,* 2015 WL 1870088, an unpublished opinion filed in April 2015.

2. *Proceedings subsequent to the first appeal that led to the second appeal*

The remittitur from appellants' first appeal issued on June 23, 2015. The parties stipulated to the appointment of a partition referee and the trial court appointed Richard M. Kipperman as the partition referee.[6] On December 1, 2015, Kipperman sought the trial court's approval of a sale of Edwards's interest in the property to Scott and Kathleen Douglas, at a "purchase price" of $445,000, to be paid through "an initial deposit of $10,000[ ] and the buyer's assumption of the existing loan on the Property, the projected payoff amount of which was $435,558.15 as of September 1, 2015." As an alternative, Kipperman requested authority to list the Property for sale at a listing price of $485,000.

---

[6] Apparently the Douglases did not notify Edwards that they intended to exercise their right to purchase her interest in the property pursuant to the interlocutory judgment.

7

Edwards opposed Kipperman's request to allow Scott and Kathleen Douglas to purchase the property pursuant to Kipperman's proposal. She argued that the proposal would allow Scott and Kathleen to acquire the property by merely assuming the joint venture's existing mortgage, but would not require that the Douglases dismiss their damage claims against Edwards, in which they were asserting that Edwards continued to owe them money "for her 'share' of this loan."[7]

The trial court denied Kipperman's request to allow Scott and Kathleen Douglas to acquire the Property under the terms proposed and instead ordered that the Property be listed for sale. On March 11, 2016, the Douglases and Edwards entered into a stipulation that allowed Scott and Kathleen Douglas to acquire the Property and to assume the mortgage. The stipulation did not relieve the Douglases of the obligation to pay money to Edwards to equalize the parties' capital accounts, and did not waive Edwards's claims based on the $277,583.72 in cash that the Douglases had obtained from the refinancing of the Property. At a hearing during which the parties' attorneys and Kipperman discussed the stipulation with the court, Kipperman stated, "I think I have good news, Your Honor. We have agreed on a price of $455,000.00 plus any excess costs paid for by the plaintiffs for the property. They are assuming the loan. All parties reserve all rights

---

[7]     Edwards argued the following:

> "It is not a cash-equivalent offer and it does not benefit defendant Whitney Edwards, half-owner of the property. Edwards does not owe $18,000 in attorney's fees incurred by the Douglases, and the Douglases cannot include that amount as part of the credit in their Offer. The Offer is a bad-faith proposal for Edwards to turn over her 50% ownership for no consideration while plaintiffs keep the $277,000 they pocketed from the proceeds of the loan on the property." (Boldface & underscore omitted.)

8

because you have a further hearing determining what the difference in the partnership is, so all parties will reserve all rights and the defendant[ ] will provide a quitclaim deed." The trial court indicated that it's understanding of the parties' stipulation was that "All means all [with respect to the reservation of rights] in my opinion. I'll interpret that as broadly as possible."

The parties filed a series of motions in limine, oppositions thereto, and supporting documentation in anticipation of the second phase of the trial. The trial court held a hearing on the parties' motions on October 31, 2016. (*Douglas v. Edwards* (Jan. 17, 2019, D072108) 2019 WL 256088, *2 (*Douglas II*).)

The Douglases filed a request that the trial court enter a final order on the motions in limine, seeking to " 'simplify the issues for trial.' " (*Douglas II, supra*, 2019 WL 256088 at p. *2.) The following day, the court held a hearing on this request and subsequently entered an order titled, " 'Order on motions in limine.' " In the order, the court stated that it had previously indicated to the parties "that the ' "scope of the evidence at the [second] phase . . . [would] be consistent with the Court's findings and orders through this [first] phase." ' " (*Ibid.*) The court's order also indicated how the court intended to instruct the jury with respect to various issues, including the following:

> " 'The Court intends to instruct the jury of the following findings:
>
> " '1. [The Douglases] and [Edwards] entered into a joint venture involving the property . . . .
>
> " '[Finding number 2 is stricken out.]
>
> " '3. In 2006, [the Douglases] and [Edwards] refinanced the property. The total amount of the refinancing was $417,000. The sum of $ 277,583.72 of the refinancing was

9

transferred to [the Douglases'] personal account. [Edwards] received none of the $ 277,583.72.

" '4. The Court conducted an accounting of [the Douglases'] and [Edwards's] capital accounts. After receiving testimony from [Edwards's] expert . . . and [the Douglases'] expert . . . , the Court determined that [the Douglases] are obliged to remit to [Edwards] the amount of $ 112,472 to equalize their capital accounts.

" '5. Since April 2009, [the Douglases] have solely occupied the property, and in 2016, pursuant to an agreement entered into between the parties under the supervision of [a judicial referee], [the Douglases] assumed the existing mortgage and purchased the property.' " (*Douglas II, supra*, 2019 WL 256088 at pp. *2–3.)

The Douglases filed a notice of appeal from the trial court's final order on the in limine motions.

On January 17, 2019, this court dismissed the Douglases' appeal from the order regarding the motions in limine, concluding that the order was not an appealable postjudgment order.

3. *Proceedings after dismissal of* Douglas II *and leading to the current appeal*

A jury trial on the parties' legal claims commenced on September 18, 2019.[8] Witnesses at the trial included Scott, Lisa, Edwards, and Todd Bulich, a real estate broker who testified regarding various methods used to

---

[8] The Douglases were pursuing claims for breach of fiduciary duty, fraud under a false promise theory, and fraud under a negligent misrepresentation theory. Edwards was pursuing claims for negligence, breach of fiduciary duty, fraud under an intentional misrepresentation theory, and fraud under a concealment theory.

10

value property, and his "broker price opinion" concerning the value of the Property at various relevant times.[9]

Consistent with the trial court's findings in the equitable phase of the litigation, the trial court instructed the jury with the following Special Instruction No. 1:

> "The Court has made the following findings of fact in this case:
>
> "1. Plaintiffs and Defendant entered into a joint venture involving the property located at 14934 Lone Oak Trail, Ramona, California ("property").
>
> "2. In 2006, Plaintiffs and Defendant refinanced the property. The total amount of the refinance was $417,000. The sum of $277,583.72 of the refinancing was transferred to Plaintiffs' personal account. Defendant received none of the $277,583.72.
>
> "3. The Court conducted an accounting of Plaintiffs' and Defendant's capital accounts. After receiving testimony from Plaintiffs' expert - Paul Zimmer, and Defendant's expert - Mark Boyer, the Court determined that Plaintiffs are obligated to remit to Defendant the amount of $112,472.80 to equalize their capital accounts.
>
> "4. On April 22, 2013, the Court granted Plaintiffs' request to dissolve, wind up, and liquidate the joint venture.
>
> "5. Since April 2009, Plaintiffs have solely occupied the property, and, in 2016, pursuant to an agreement entered into between the parties under the supervision of Referee Richard Kipperman, Plaintiffs assumed the existing mortgage and purchased the property.
>
> "You must accept that these facts are true."

---

[9]     Mr. Bulich indicated that his "broker price opinion" is not the same as "a formal appraisal."

The jury returned its special verdicts on September 25, 2019. The jury found in Edwards's favor with respect to both the Douglases' claims against Edwards and Edwards's cross-complaint. Specifically, the jury found that the Douglases were negligent, breached their fiduciary duties, and committed fraud. The jury determined that the Douglases' conduct had caused harm to Edwards, or was a substantial factor in causing her harm, and concluded that Edwards had suffered damages in the amount of $112,472.80.

The trial court entered judgment in favor of Edwards in the total sum of $112,472.80 on October 11, 2019. Edwards sought prejudgment interest on that amount for the time period between the trial court's statement of decision in the first phase of the litigation through September 25, 2019, the date of the jury's verdict. The court granted Edwards's request for prejudgment interest, ordering the Douglases to pay Edwards $50,797.35 in interest.

The Douglases filed a timely notice of appeal from the final judgment.[10]

---

[10] On December 29, 2020, after filing her Respondent's Brief in this appeal, Edwards filed a request for judicial notice in which she sought judicial notice of the "appellate records and [this court's] prior unpublished opinions from Court of Appeal case [N]umbers D064389 and D072108." The Douglases did not oppose Edwards's request for judicial notice. Given the relevance of these documents to the arguments presented in this appeal, we grant the request for judicial notice of the appellate records and our prior opinions in case Numbers D064389 and D072108. (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

III.

DISCUSSION

A. *The jury's verdicts demonstrate that the jury found that Edwards suffered damages*

The Douglases contend that because "the jury found no damage other than what was required to equalize the accounts, they made no finding of damage relating to the alleged torts." According to the Douglases, because the jury awarded damages in "the exact amount that the Court instructed the jury it had found 'to equalize capital accounts,' " this must mean that the jury concluded that Edwards did not suffer damages from the fraud and breach of fiduciary duties. We disagree.

In the special verdict form that the jury completed, the jury specifically found that the Douglases were negligent, committed fraud, and breached their fiduciary duty to Edwards. The jury also specifically found that the Douglases' negligent conduct, fraud, and breach of fiduciary duty caused Edwards harm or were substantial factors in causing her harm. After making these findings, the jury proceeded to award damages to Edwards by writing in the figure $112,472.80 on the special verdict form where the form asked "What are Cross-Complainant's damages?" It is thus clear that the jury *did* conclude that Edwards was harmed by the Douglases' tortious conduct and awarded Edwards a specific amount of damages to compensate her for this harm.

Nevertheless, and although the Douglases' argument on this point is difficult to discern, the Douglases suggest that the jury's special verdicts are invalid because the jury concluded that Edwards suffered damages in the same amount as the equalization payment the trial court had previously determined Edwards was entitled to receive. The Douglases imply that the

13

jury's decision to award damages in the same amount as the trial court determined was the amount required to equalize the parties' capital accounts somehow rendered the jury's damages award equivalent to *zero*. Based on the premise that the jury made no finding of damages, the Douglases suggest that the jury did not find them liable for any of the torts that Edwards alleged against them.

This argument is based on the erroneous assumption that the jury's award of $112,472.80 in damages is equivalent to an award of no damages for the torts that Edwards alleged because it is the same amount that the trial court had determined, in the first phase of the trial, the Douglases would have to pay Edwards to equalize the parties' capital accounts. However, as the trial court told the attorneys after the jury's verdict, "I said it [the $112,472.80] was a capitalization equalization kind of payment. And then the jury converted that into damages in the second trial on the legal claims. And what they did was consistent with what the Court had [found regarding the accounting] years ago. I mean, I don't see any inconsistency here." In other words, the trial court determined that the jury's award of the $112,472.80 that the court had found would be required to equalize the parties' capital accounts—taking into account that Edwards had received none of the $277,583.72 cash out from the refinance but had continued to make payments on the mortgage—was an appropriate damages award that was consistent with what the trial court's accounting had revealed.

Further, the record demonstrates that in closing argument, Edwards's attorney specifically requested a damage award in the very amount that the jury ultimately awarded her:

> "The Douglases have never paid any money to my client. They stood up here yesterday disputing even this judge's findings, because they can't accept the judge's findings.

14

They won't accept the judge's findings. [¶] So my client's damages for their breach of fiduciary duty, their acting inconsistently against her interests in the property -- and remember what I'm saying is what they did is they took the refinance from mom, paid mom back, they did a deal right over my client. My client is not out there on the ground. She's not out there on the land. She's not out there enough. They did a family, a Douglas family, deal. So my client is not asking you to award her half of the $277,000. She's just asking you to award her the money that the judge said she's owed for their breach. She's just asking you for her fair share. She paid more, the Douglases benefited, and she didn't. [¶] . . . [¶] So I'm winding up here, and I really appreciate your attention and your time in this case. I want to just say thank you very much. *My client requests what the Court found -- has already found is due to her, a finding of fact of $112,472.80. That's what she's asking for in this case.* [¶] Thank you all very much." (Italics added.)

The Douglases' attorney did not object to this argument, nor did he argue that this amount was unsupported by the evidence. Rather, in response, the Douglases' attorney argued that Edwards owed the Douglases approximately $112,000 as the remaining balance they claimed was her portion of the refinance mortgage, and that therefore, neither party should be required to pay the other party anything: "Let's just make peace between the parties. There's $112,000 that [Edwards] owed and never paid, and we're simply saying let's put it to bed. Nobody owes anybody anything. There's been losses all around."

The jury clearly found that Edwards was entitled to the amount of damages that she requested for the tort claims that she asserted against the Douglases, given that the jury awarded her the amount of damages that her attorney requested. The jury also rejected the Douglases' claim that Edwards owed them any money. The amount that the jury awarded is supported by substantial evidence. The evidence demonstrated that the $112,472.80

15

damages award was intended, at least in part, to account for the fact that Scott and Lisa took more than $277,000 in cash from the proceeds of the refinancing loan for their own personal use, and Edwards continued to make payments on the full amount of the mortgage, which included this significant sum of cash.

In view of this evidence, and the fact that the jury was informed that Scott and Lisa assumed the mortgage, it is not only possible, but likely, that the jury concluded that Edwards had suffered no additional monetary damages as a result of the sale to Scott and Lisa, and that the proper amount to award Edwards in damages was the full amount of the payment that the trial court had concluded would be necessary to equalize the parties' relative positions prior to any sale.

The jury's verdict in this regard was proper. The trial court undertook an accounting in the first phase of the bifurcated trial and determined that there was a liability in the amount of $112,472.80 from the Douglases to Edwards. (See 1 Cal.Jur.3d Accounts and Accounting, § 82 [an accounting is used to "show the amount of the liability" that exists as between parties].) The trial court told the parties that its findings in the first phase of the trial would be binding on the jury in the second phase, and, consistent with this, the court informed the jury of its findings with respect to the accounting completed in the first phase.[11] None of this should have come as a surprise

---

[11] It was clear at the conclusion of the first phase of the trial that the trial court intended to instruct the jury with respect to its findings in the first phase of the trial, and it was also clear that those factual findings would be binding on the jury. After the first phase of the trial, the court told counsel, " 'I don't recall now how many days we spent in trial, but it has occurred to me that if in fact the case [has] not resolved itself before we proceed to the next phase of a jury trial, that the findings and orders that the Court has made *will be tantamount to an exhaustive motion [in] limine ruling*[ ]. And the

16

to the Douglases. We reject as disingenuous any suggestion that the jury's award of the very amount of damages that Edwards requested from the jury means that the jury found no tort liability and awarded "no" damages.

As noted, in phase 1 of the bifurcated trial, the trial court did not *award* Edwards the $112,472.80 that the court determined would be required to equalize the parties' capital accounts. Thus, at the time the jury was considering whether Edwards had been damaged, Edwards had neither been awarded nor received that equalization payment. The jury was free to conclude that Edwards was entitled to recover this amount as damages.

The error in the Douglases' understanding of this case is apparent from statements made in their reply brief. They complain that, in Edwards's respondent's brief, "Edwards seemingly mocks the quoted portion of Appellants' counsel's closing argument that Appellants were harmed by the finding that they owed Edwards $112,472.80." They then state that "it is undisputed that the maximum amount of money that [Edwards] contributed to the joint venture was substantially less than this amount," and "[t]*here is no basis for Edwards to be entitled to more money than she invested when the Property was sold for an amount that realized no profit for any of the parties*." (Italics added.) However, the fact that the amount the jury awarded to Edwards as damages was more than she had invested makes it clear that the jury determined that Edwards was in fact damaged as a result of the Douglases' fraud, breach of fiduciary duty, and negligence. The jury could have concluded that Edwards would never have agreed to refinance the loan

scope of the evidence I would fully expect will not be nearly as broad as one of you want[s] it to be, or nearly as narrow as one of you would like it to be. But you should fully expect that the next phase—the scope of the evidence at the next phase, if there is one, will be consistent with the Court's findings and orders through this phase.' " (*Douglas I, supra*, 2015 WL 1870088 at p. *4, italics altered.)

on the property in order to take out a large amount of cash, allow the Douglases exclusive access to that cash, and continue to make payments on the full amount of that loan.

B. *The bifurcation did not "limit[ ] damages in the second phase" and the trial court's instruction to the jury with respect to its phase one findings was not "confusing and erroneous"*[12]

The Douglases next contend that, "rather than converting a 'capitalization equalization' obligation into a damage [award], the jurors were merely following the judge's order to put a specific, pre-determined amount in the verdict form." The Douglases assert that the "judge's order was 'binding' and from the defendant['s argument], [the jurors] understood they had no choice." The Douglases "contend a layperson on the jury who is instructed as to an amount one party is 'obligated' to pay to another party is put in the impractical position of distinguishing that 'obligation' from a finding of damages." We reject this contention. The trial court's instructions to the jury did not purport to bind the jury with respect to the amount of damages that it could award. Further, there is no support in the record for the contention that the jury believed it was required to award Edwards the amount that the court had determined would be required to equalize the parties' capital accounts. Again, Edwards's attorney told the jury in closing argument that Edwards was asking for only that specific amount in damages. The jury clearly concluded that the Douglases' conduct constituted tortious behavior that resulted in harm to Edwards. The jury was free to rely on the court's findings of fact regarding the amount of money that the Douglases would have to pay Edwards in order to make things equal between the parties in determining an appropriate damages award, particularly in view of

---

[12] We have omitted the capitalization from the quotations taken from the Douglases' brief.

the fact that the court had taken into consideration in its accounting the fact that the Douglases obtained more than $277,000 in cash from the refinancing while Edwards received no cash and continued to make mortgage payments on the larger loan amount. The Douglases' assertion that Special Instruction No. 1 regarding the court's findings in the first phase of the trial constituted an "order" telling the jury what to award constitutes pure speculation as to what the jury did and why.

Further, to the extent that the Douglases contend that Special Instruction No. 1 "unfairly prejudiced" them, we reject this contention, as well. All of the parties were made aware after the conclusion of the first phase of the trial that the trial court intended to instruct the jury consistent with the court's findings in that phase. The court informed the parties of its intention in this regard in no uncertain terms at the conclusion of the first phase of the trial: " '[I]t has occurred to me that if in fact the case [has] not resolved itself before we proceed to the next phase of a jury trial, that the findings and orders that the Court has made *will be tantamount to an exhaustive motion [in] limine ruling*[ ].' " (*Douglas I, supra*, 2015 WL 1870088 at p. *4, italics added.)[13] The Douglases proceeded to trial, knowing that the court intended to instruct the jury with respect to the facts that it had determined in the first phase, and knowing that this court had affirmed not only the trial court's findings but also the court's intention to make those findings binding in the second phase of the trial, in the event that the case

_____

[13] Throughout the remainder of the litigation after the first phase of trial, the trial court repeatedly indicated that it would inform the jury that the Douglases owed Edwards $112,472.80 in order to equalize their joint venture capital accounts.

19

did not resolve.[14]  The Douglases were not "unfairly prejudiced" by the court's decision to "provid[e] the jury with Special Instruction No. 1."  That instruction merely informed the jury, among other things, that the court had conducted an accounting and had determined an amount that the Douglases would have to pay Edwards in order to equalize the parties' capital accounts.  In informing the jury regarding these findings of fact, Special Instruction No. 1 was consistent with the very purpose of bifurcating the trial, i.e., the promotion of judicial economy by minimizing the risk of inconsistent findings as to the equitable and legal claims.  (See *Douglas I*, at p. *4.)

We also disagree with the Douglases' contention that Edwards's trial counsel's reference to the trial court's equalization payment finding indicated to the jury that "they had no choice or opportunity to employ their independent thinking because the amount of damages had already been set by the trial court . . . ."  In support of their claim, the Douglases point to two statements made by Edwards's attorney during closing arguments.  First, they note the following statement:  "There are findings in this case that bind you.  The judge read them to you yesterday, but I'm going to put them up on the board.  Because these are findings that control your decision in this case.  You are bound by them.  Whether you agree with them or not, you're bound by them.  We are all bound by them."  The Douglases also note the following

_____

14     As we determined in *Douglas I*, the trial court did not abuse its discretion in bifurcating the trial; the court "was properly motivated by concerns for judicial economy" when it did so.  (*Douglas I, supra*, 2015 WL 1870088 at p. *4.)  We explained that the reason "why trying equitable claims first promotes judicial economy" is precisely *because* "[t]he trial court's phase one findings will be binding on the jury in phase two, thus minimizing—if not eliminating altogether—the risk of inconsistent findings." (*Ibid.*, citing *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 158 ["The rule minimizes inconsistencies, and avoids giving one side two bites of the apple.  [Citation.]  The rule also prevents duplication of effort"].)

statement: "[Edwards is] just asking you to award her the money that the judge said she's owed . . . ." These statements, the Douglases assert, essentially told the jury that it could not exercise independent judgment in awarding damages. As noted, the Douglases' attorney raised no objection to these remarks when they were made, thereby forfeiting their ability to challenge them on appeal. (See, e.g., *People v. Centeno* (2014) 60 Cal.4th 659, 674 [failure to object to argument forfeits claim on appeal].) In addition, Edwards's attorney was simply stating what was true—that the trial court had made findings, including a finding that the Douglases would have to pay Edwards $112,472.80 to equalize the parties' capital accounts, and that Edwards was asking the jury to find that the Douglases were negligent, committed fraud, and breached their fiduciary duties to her, leaving Edwards at a $112,472.80 deficit. Although Edwards's attorney argued that the jury was bound by the court's findings from the first phase, he did not argue that the jury was *required* to award Edwards that amount in damages. Therefore, even if the Douglases had not forfeited this claim, we would conclude that Edwards's attorney's closing argument was not improper.

C. *To the extent that we can discern the meaning of the Douglases' argument regarding their perceived lack of opportunity to present "contract evidence," the argument is without merit*

The Douglases complain that "it is error to deprive a party [of] an opportunity to present contract damage claims to [the] jury," and imply that the trial court deprived them of the opportunity to have a jury determine their contract claims by preventing them from presenting evidence that there were "contractual obligations . . . between the parties." Although their argument on this point is not at all clear, the Douglases seem to suggest that the trial court did not allow them to present evidence demonstrating that Edwards had taken out a "loan" from them, pursuant to which she had an

21

"ongoing obligation . . . to complete her installment payments due on her loan." For example, the Douglases state that "[w]hile [Edwards] made multiple motions to exclude from evidence any agreement to make loan payments to the Plaintiffs, there is no evidence in the record that Mr. Boyer included that ongoing obligation in his accounting." Although the Douglases's argument is unclear, they appear to believe that the trial court's decision to inform the jury about the results of the court's accounting, which they contend did not include the fact that Edwards owed them money pursuant to this purported "loan," meant that the court denied them an opportunity to present their contract damage claims to the jury.

The Douglases do not cite to any portion of the record that would support the argument that they set forth under the heading "TRIAL COURT FAILED TO CONSIDER CONTRACT EVIDENCE." It is well understood that an appellate court may treat as forfeited an argument that is not supported by citations to the record. (See, e.g., *Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970 [appellate court may "disregard contentions unsupported by proper page cites to the record"]; *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 [appellate court "may ' "disregard any factual contention not supported by a proper citation to the record" ' "]; *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 589 ["An appellant who fails to cite accurately to the record forfeits the issue or argument on appeal that is presented without the record reference"].) In addition, the failure to set out a cogent legal argument likewise results in forfeiture of the argument. (See, e.g., *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [noting that courts " 'are not bound to develop appellants' argument for them' " and " 'fail[ure] to support [a point] with reasoned argument and citations to

22

authority' " results in forfeiture; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 ["The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived"].) Although the Douglases cite to various legal authorities, it is not clear how these authorities apply to this matter or demonstrate error with respect to "contract evidence" (capitalization omitted).[15] In sum, we have no way of addressing the argument that the Douglases make in this section of their brief because we are unable to discern what that argument is.

In a separate section of their brief, the Douglases contend that "[t]he jury should have determined the contractual relationships between the parties," and further argue that "[t]he jury should have been permitted to determine whether the Defendant agreed to pay for the construction of the

_____

[15] Although the argument heading refers to the trial court's purported "fail[ure] to consider contract evidence" (capitalization omitted), there is only one other reference to anything akin to "contract evidence" in the entire argument under this heading. That reference, which is to evidence of "any agreement to make loan payments," was made with respect to Edwards's purported "multiple motions to exclude from evidence any agreement to make loan payments to the Plaintiffs." Again, there is no citation to the record with respect to this factual assertion. Further, the fact that Edwards may have sought to exclude evidence of an unspecified agreement does not provide this court with any information or argument as to what the trial court purportedly did or why what the court did was error. In fact, the next portion of the sentence refers to there being "no evidence in the record that Mr. Boyer included that ongoing obligation in his accounting." Anything that occurred in the accounting portion of the litigation is not at issue in this appeal; those matters were the subject of the appeal in *Douglas I*. Insofar as the Douglases are attempting to revisit the accounting based on an argument that a purported loan between them and Edwards was not taken into consideration, they are foreclosed from doing so because *Douglas I* is final. To the extent that the Douglases are suggesting that the accounting had an impermissible collateral effect on the legal phase of the litigation, they have failed to provide a clear or cogent argument in this regard.

23

House, whether she contributed to the construction of the House, whether she paid taxes on the House, and whether she was entitled to any benefit from the House." However, in their verified complaint, the Douglases asserted that they were solely responsible for the cost of construction of the home and entitled to the benefits of the home. Consistent with this assertion, the trial court found this as a fact in the first phase of the trial and accordingly, excluded the home from its accounting.[16] Because this issue was adjudicated in an earlier phase of the bifurcated trial, a form of "quasi-collateral estoppel" occurs, such that this finding was binding in the later phase and relitigation of this issue would have been improper. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1244 ["Just as the parties are bound by collateral estoppel where issues are litigated in a prior action, so, too, do issues decided by the court in the equitable phase of the trial become 'conclusive on issues actually litigated between the parties' "]; see *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 359 [" 'Issues adjudicated in earlier phases of a bifurcated trial are binding in later phases of that trial and need not be relitigated. [Citations.] No other rule is possible, or bifurcation of trial issues would create duplication, thus subverting the procedure's goal of efficiency. [Citation.] "[D]uplication of effort is the very opposite of the purpose of bifurcated trials" ' "].) In view of this principle, the trial court did not err in declining to allow the jury to consider the previously determined issue of whether the parties had entered

---

16  As we confirmed in *Douglas I*, the trial court accepted the Douglases' assertion that " 'the "costs and benefits" of the "construction" for Plaintiffs to build a house would belong "exclusively" to the party building the house,' " and concluded that " 'the evidence of plaintiff[s'] construction costs to build their house . . . [was] irrelevant to all claims involving the alleged partnership.' " (*Douglas I, supra*, 2015 WL 1870088 at p. *9.)

into a contractual arrangement with respect to the home that the Douglases built on the Property.

D. *The Douglases' challenges to aspects of the trial court's accounting are not cognizable in this appeal from the second phase of the litigation; these issues were decided in the first phase and the trial court's interlocutory judgment was affirmed on appeal in* Douglas I

The Douglases set forth seven claims of error with respect to the accounting that the trial court completed in the first phase of the litigation, as follows: (1) "in the balancing of capital accounts"; (2) "as it includes costs for horse care"; (3) "for failure to include property taxes"; (4) "for inclusion of false credits"; (5) "as it omits parties' obligations"; (6) "as it omits pre-sale activity"; and (7) as it "excludes value of land." (Capitalization omitted.)

Each of these contentions seeks to undermine the trial court's determination, based on Boyer's expert testimony, that " 'the amount necessary to equalize the capital accounts' between the parties" was $112,472.80, a finding that the court made in its 2013 Statement of Decision, from which the Douglases appealed. (See *Douglas I, supra*, 2015 WL 1870088 at p. *3.) The judgment from which the Douglases *currently* appeal is the final judgment entered after a jury trial, at which the Douglases sought damages from Edwards on their claims that she defrauded them, and Edwards sought damages from the Douglases on her claims for fraud and breach of fiduciary duty. The equitable accounting that occurred in this matter was completed by the trial court after a bench trial in 2012. The equitable phase of the litigation is the portion of the litigation in which the trial court relied on Boyer's testimony; Boyer did not testify at the 2019 jury trial that resulted in the final judgment now being appealed. The trial court's accounting resulted in an interlocutory judgment entered by that court in 2013, and from which the Douglases appealed. Thus, all of the

Douglases' challenges to Boyer's accounting as between the parties—e.g., that he failed to consider tax payments made by the Douglases, that he credited Edwards with horse care costs, that he failed to properly account for property taxes, that he gave Edwards a credit for a payment not made, that he failed to include in his analysis the value of the land, etc.—either were or should have been raised in the appeal from the trial court's interlocutory judgment.

In fact, the Douglases *did* raise questions about the validity of the accounting, and challenged Boyer's testimony and evidence, in their appeal in *Douglas I*. For example, in their briefing filed in that appeal, the Douglases argued that the trial court "committed error by failing to include an accounting whereby the parties' investments in the Property were considered and applied to the monies due and owing to offset the final determination." They also raised questions about expenditures for repairs, improvements and taxes. The Douglases disputed a number of items in *Douglas I* that they raise again in the present appeal, including the costs of construction of the house, horse care expenses, property taxes, the value of the land, and alleged improper credits. Thus, the Douglases had an opportunity in *Douglas I* to challenge the testimony presented by Mark Boyer, and in fact did so.

The Douglases' challenges to the trial court's accounting were considered and addressed on the merits in *Douglas I* and this court affirmed the trial court's rulings. Our decision in *Douglas I* pertaining to the trial court's accounting in the first phase of the trial constitutes law of the case and is final. (See, e.g., *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301–302 ["Under th[e law of the case] doctrine, 'the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case' "]; *City*

26

*of West Hollywood v. Kihagi* (2017) 16 Cal.App.5th 739, 749 (*City of West Hollywood*); *People v. Boyer* (2006) 38 Cal.4th 412, 443.)  The rule regarding law of the case is " 'one of procedure that prevents parties from seeking reconsideration of an issue already decided absent some significant change in circumstances.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2013) 215 Cal.App.4th 1495, 1505.)

E.   *The Douglases may not raise claims that the trial court erred with respect to their claims for quiet title and constructive trust in this appeal*

The Douglases contend that they continue to have "viable" (capitalization omitted) quiet title and constructive trust claims, and that the trial court should have considered those claims, and erred in failing to do so. However, the trial court sustained a demurrer to these causes of action in 2011, and in our opinion in *Douglas I*, this court affirmed the trial court's interlocutory judgment with respect to these claims. (*Douglas I, supra*, 2015 WL 1870088 at p. *10.)

In their first appeal, the Douglases asserted that trial court " 'erred by failing to consider [their] rescission, quiet title, and constructive trust' " claims. (*Douglas I, supra*, 2015 WL 1870088 at p. *10.)  This court considered the Douglases' contentions with respect to these claims, and determined that the Douglases had forfeited their contentions for two reasons—they failed to raise their contentions in the trial court, and failed to properly present their arguments in their appeal from the interlocutory judgment.  As we stated with respect to the latter:

> "The Douglases' dismissed causes of action all relate to the parties' ownership interests in the Property, which the trial court determined in connection with the interlocutory judgment of partition.  Thus, the Douglases could have, but have not, sought review of the trial court's demurrer ruling in this appeal." (*Ibid.*, fn. omitted.)

27

Our affirmance of the trial court's demurrer rulings with respect to the Douglases' quiet title and constructive trust claims in *Douglas I* became law of the case. (See *City of West Hollywood, supra*, 16 Cal.App.5th at p. 749.) Because this court considered and rejected as forfeited the Douglases' challenge to the trial court's sustaining of Edwards' demurrer to the quiet title and constructive trust claims in *Douglas I*, we will not entertain in this appeal the Douglases' attempt to again challenge the trial court rulings on Edwards' demurrer.

Further, the Douglases concede that they have acquired title to, and ownership of, the Property pursuant to a stipulation entered in 2016. As a result, there is no continuing controversy regarding ownership of the property. (See *Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 820–821 [where property has been sold, "there remain no prospective claims appropriate for declaratory relief," including claim for quiet title].)

F. *The Douglases have not demonstrated that the trial court erred in awarding prejudgment interest*

After the final judgment was entered, pursuant to a motion filed by Edwards, the trial court added to the judgment prejudgment interest in the amount of $50,797.35, for the time period between April 30, 2013, the date on which the court entered the interlocutory judgment after the bench trial in phase one, and the entry of the final judgment. In awarding prejudgment interest, the trial court determined that "the recoverable damages became 'certain' as of the date the interlocutory judgment was entered: April 30, 2013," and noted that the amount of damages that the jury awarded was identical to the "equalizing payment set forth within the interlocutory judgment." The Douglases contend that the trial court erred in awarding Edwards prejudgment interest with respect to the damages awarded by the

28

jury, because, they assert, as of April 30, 2013, "no one knew the price for which the property would sell," which, they indicate, could have affected the "final accounting" between the parties.

A party may request prejudgment interest in a non-contract case pursuant to Civil Code section 3287, which provides in relevant part: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt." (*Id.*, subd. (a).)[17] "Conceptually, prejudgment interest is an element of damages, not a cost of litigation. [Citation.] Prejudgment interest compensates the plaintiff for the loss of the use of property or money during the period before the judgment is entered. [Citation.]" (*Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 293.)

" ' "Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage." [Citation.]' [Citation] Thus, ' " '[t]he test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether defendant actually know[s] the

---

[17] Subdivision (b) of Civil Code section 3287 allows for the discretionary recovery of prejudgment interest in certain circumstances in a contract action: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

amount owed or from reasonably available information . . . the defendant [could] have computed that amount.' " ' " (*Duale v. Mercedes–Benz USA, LLC* (2007) 148 Cal.App.4th 718, 728–729, italics omitted.)  In most cases, "the certainty required of Civil Code section 3287, subdivision (a), is absent *when the amounts due turn on disputed facts*, but not when the dispute is confined to the rules governing liability."  (*Olson v. Cory* (1983) 35 Cal.3d 390, 402, italics added.)

On appeal, the Douglases suggest that because "no one knew the price for which the property would sell" as of April 30, 2013, the "amount to balance capital accounts was still uncertain in 2016."  However, the trial court found in the first phase of the trial that the Douglases had benefitted from the joint venture *relative to Edwards* in the amount of $112,472.80 and that this was the amount that the Douglases would have to pay Edwards to equalize the parties' capital accounts.  The Douglases have not demonstrated how any subsequent events would have changed the relative positions of the parties after the court made these findings.  The Douglases refer to a "new analysis" performed by Boyer, "the expert upon whom the trial court relied in 2013 to do an equalization of accounts," and suggest that Boyer determined that the capital accounts "would be balanced if the Plaintiffs paid the Defendant 66,236.00 or about 60% of damages fixed by the trial court in 2013."  However, the record citations that the Douglases provide to support their claims regarding the purported 2016 "new analysis" performed by Boyer are to pages in the record that do not appear to reference Boyer at all.  In addition, without further explanation as to what, precisely, their argument is with respect to this issue, the Douglases' reference to a "new analysis" by an expert and their assertion that this somehow undermines the court's

determination that they either knew or could have determined that they would owe Edwards $112,472.80 is simply unclear.

Rather than provide reasoned argument in this regard, the Douglases assert that they "did not know in 2016 that by relieving [Edwards] of her entire joint venture obligation that they had not fully balanced the capital accounts or had, at least, significantly reduced any amount owed to [Edwards.]"  However, the purpose of the court's accounting in the first phase of the trial was to determine what amount the Douglases would have to *pay* Edwards in order to equalize the parties' capital accounts.  The Douglases have not explained their contention that they "did not know" that they had not "fully balanced the capital accounts" after the 2016 stipulation between the parties pursuant to which the Douglases took over the existing mortgage. They point to nothing in the record that would demonstrate that when they agreed to purchase the Property from the joint venture by taking over the full mortgage obligation, the parties understood or agreed that the Douglases' $112,472.80 obligation to Edwards would be extinguished.

As the appellants, the Douglases have the burden of overcoming the presumption of the correctness of the judgment.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 ["[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment"].)  The burden placed on an appellant to affirmatively demonstrate error is " 'not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Ibid.*)  The Douglases have not met this burden with respect to their argument that the trial court erred in awarding Edwards prejudgment

31

interest because they have not shown that they could not have ascertained, from reasonably available information—such as the trial court's factual finding that they owed Edwards $112,472.80 in order to equalize the parties' capital accounts—that they would ultimately be liable to Edwards for that amount.

## IV.

## DISPOSITION

The judgment is affirmed.  Edwards is entitled to costs on appeal.


AARON, J.

WE CONCUR:

HALLER, Acting P. J.

GUERRERO, J.