Filed 9/18/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JIANNA MAARTEN et al., | B308055 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCV00094) |
| v. | |
| ISAAC COHANZAD et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Yvette Palazuelos, Judge. Reversed and remanded.

Moneymaker & Stewart, Ryan Stewart; Tycko & Zavareei, Annick Persinger and Hassan Zavareei for Plaintiffs and Appellants.

Law Office of Parham Hendifar and Parham Hendifar for Defendants and Respondents.

————————————————

The plaintiffs appeal from a trial court order sustaining a demurrer to the class allegations in their complaint against the defendants, their former landlords.[1] The complaint asserts claims under the Ellis Act (Gov. Code, § 7060 et seq.)[2] and the Los Angeles Rent Stabilization Ordinance (the Ordinance) (Los Angeles Municipal Code (LAMC), §§ 151.00–151.31), as well as for fraud and violations of section 17200 of the Business and Professions Code (Unfair Competition Law) (Bus. & Prof. Code, § 17200 et seq.). Defendants evicted plaintiffs from their rent controlled apartments. Plaintiffs allege that although defendants declared they were removing the apartment buildings from the rental market entirely, defendants subsequently listed units in the same buildings for rent on Airbnb, thereby returning the properties to the residential rental market while evading rent control laws, before eventually demolishing the buildings to make way for new construction.

Defendants demurred to the class allegations in the complaint, asserting plaintiffs could not satisfy the requirements for class certification as a matter of law. The trial court found plaintiffs could not satisfy the community of interest requirement

---

[1] The named plaintiffs are Jianna Maarten, Joanne Maarten, Richard Koehler, Joseph Fria, Ashleigh Wulff-Giron, Alana Beck, Brandon Biggins, Brenda Davidson, Patricia Miranda, Ana Reyes, Julio Vargas, Miguel Rivas, Miriam Rivas, Carlos Castillo, and Natalie Hermosillo (collectively plaintiffs). The defendants are Isaac Cohanzad, Benjamin Cohanzad, Wiseman Management LLC, Belmond Homes, LP, The Cohanzad Family Trust, and Hayworth Hyde LLC (collectively defendants).

[2] All further undesignated statutory references are to the Government Code.

2

for liability or damages, and class treatment was not the superior method for resolving the litigation.

We conclude the trial court erred in finding, as a matter of law, that there is no reasonable probability plaintiffs will show common questions of law or fact predominate as to the classwide claims for liability. While plaintiffs' allegations indicate a need for individualized proof or calculation of damages, we conclude plaintiffs have alleged such issues may be effectively managed and there remains a reasonable probability plaintiffs will satisfy the requirements for class certification. We reverse and remand with directions to reinstate the class allegations.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' original complaint, filed in January 2019, asserted a theory of class liability based on the Ordinance, specifically LAMC section 151.25, which incorporates the Ellis Act. Under that provision, when a rent-controlled property is withdrawn from the rental market pursuant to the Ellis Act, but is offered again for residential rental within two years, "[t]he landlord shall be liable to any tenant or lessee who was displaced from the property for actual and exemplary damages." (LAMC, § 151.25, subd. (A).) Plaintiffs filed a first amended complaint in June 2019. Defendants demurred to the class allegations. The trial court determined plaintiffs adequately alleged that common issues predominated as to their first cause of action for liability under the Ellis Act. However, the court found plaintiffs had not alleged sufficient facts to support a class claim for fraud and thus sustained the demurrer with leave to amend.

Plaintiffs filed a second amended complaint in January 2020. The complaint asserts six causes of action: (1) violation of the Ordinance, LAMC sections 151.00–151.31; (2) fraud;

3

(3) violation of the Unfair Competition Law; (4) breach of the covenant of quiet enjoyment; (5) intentional infliction of emotional distress; and (6) breach of the warranty of habitability. Plaintiffs again seek to bring their first three causes of action on behalf of a class.

According to the complaint, Wiseman Management LLC (Wiseman) owns and operates at least 35 apartment buildings in Los Angeles. Isaac Cohanzad, Benjamin Cohanzad, and Michael Cohanzad control Wiseman and have created various shell companies to carry out their business practices. The complaint alleges Wiseman buys rent-controlled buildings and falsely declares to the City of Los Angeles (the City) that it is permanently removing all of the units in the buildings from the rental market, thus allowing it to evict the existing tenants. Wiseman then offers the apartments for rent on Airbnb before eventually tearing down the properties, constructing new buildings, and renting out new apartments for as much as $5,195 per month.

Plaintiffs resided in apartment buildings owned by defendants and subject to the Ordinance. After defendants submitted a Notice of Intent to Withdraw from the rental market for each building, they received approval from the City to evict the tenants. Defendants used the "standard Ellis Act form" and made identical representations to the City on each form, certifying that all accommodations in the building would be permanently removed from rental housing. Defendants then provided each plaintiff and class member an eviction notice on the City's standard form.

According to the complaint, after the evictions, defendants, using various aliases, offered to rent or re-rented the apartments

on Airbnb. The Airbnb postings allow hosts to set a minimum and maximum number of nights for a rental. The complaint alleges that "[v]irtually all the Airbnb listings posted by Defendants had a maximum stay of 1,125 nights, and at least nine included optional 'monthly' rates." Two hosts linked to defendants' properties had at least 42 Airbnb listings each. There were other alias host names as well, with listings matching Wiseman properties for which notices of withdrawal were filed.

Plaintiffs seek to certify a class of "former tenants of any property owned by any Defendant who were displaced from their rental units pursuant to the Ellis Act and where at least one rental unit within their buildings was offered for rent or lease within two years of the date of the withdrawal of that rental unit from the rental market."

Defendants successfully demurred to the second amended complaint. The trial court rejected the prior court's determination that the class allegations in the first cause of action were sufficient. Instead, the court concluded individual issues predominated as to all of plaintiffs' claims, including liability under the Ellis Act. The trial court also found common issues did not predominate as to damages, and that a class action was not a superior means of litigating plaintiffs' first three causes of action. The court granted leave to amend. Plaintiffs timely appealed the trial court order.[3]

---

[3] An order sustaining a demurrer to class allegations is appealable under the " 'death knell' doctrine," regardless of whether leave to amend is granted. (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 757; *Williams v. Impax Laboratories, Inc.* (2019) 41 Cal.App.5th 1060, 1070–1071.)

# DISCUSSION

## I.    Standard of Review

Although a court generally determines whether a case is suitable for class treatment on a motion for class certification, it is "beyond dispute that trial courts are permitted to decide the issue of class certification on demurrer." (*Schermer v. Tatum* (2016) 245 Cal.App.4th 912, 923 (*Schermer*).)  A trial court "may decide the question earlier [than class certification] by sustaining a demurrer to the class action allegations of a complaint only if it concludes as a matter of law that, assuming the truth of the factual allegations in the complaint, there is no reasonable possibility that the requirements for class certification will be satisfied." (*Bridgeford v. Pacific Health Corp.* (2012) 202 Cal.App.4th 1034, 1041–1042 (*Bridgeford*), citing *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 813; *Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 211 (*Tucker*).)

The general principles that govern review of an order sustaining a demurrer apply to an order specific to class allegations.  (*Schermer, supra*, 245 Cal.App.4th at pp. 922–923; *Newell v. State Farm General Ins. Co.* (2004) 118 Cal.App.4th 1094, 1100 (*Newell*).)  We review the " ' "complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose." [Citations.]' [Citation.]" (*Tucker, supra*, 208 Cal.App.4th at p. 210; *Schermer*, at p. 922.)  "The court does not, however, assume the truth of contentions, deductions or conclusions of law." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 (*Aubry*); *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 713.)

"If a demurrer is sustained, we exercise our independent judgment on whether a cause of action has been stated as a matter of law, regardless of reasons stated by the trial court. [Citation.] We affirm if the trial court's decision was correct on any theory. [Citation.]" (*Tucker*, *supra*, 208 Cal.App.4th at pp. 210–211.)

## II. Applicable Law on Class Certification

A class action may be maintained if there is an ascertainable and sufficiently numerous class, a well-defined community of interest among the class members, and substantial benefits from certification render proceeding as a class superior to other alternatives. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*); Code Civ. Proc., § 382.) The trial court concluded plaintiffs established there is an ascertainable class and defendants do not challenge that analysis on appeal. Instead, the parties' dispute concerns the community of interest and superiority requirements.

"As part of the community of interest requirement, the party seeking certification must show that issues of law or fact common to the class predominate." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28 (*Duran*).) This inquiry " 'hinges on "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." [Citation.] "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." [Citations.]' " (*Ibid.*)

To determine whether common issues predominate, the court must ask whether " 'the issues framed by the pleadings and

7

the law applicable to the causes of action alleged' " are "susceptible of common proof" for all members of the proposed class (*Brinker*, *supra*, 53 Cal.4th at p. 1024), or whether the class members will be " 'required to litigate numerous and substantial questions determining [their] individual right to recover . . . .' " (*Duran*, *supra*, 59 Cal.4th at p. 28.)  The predominance inquiry focuses on the facts and the elements necessary to establish the defendant's liability.  (*Ibid*.; *Brinker*, at p. 1024.)

We therefore first determine what plaintiffs must prove to establish defendants' liability, and whether those elements are susceptible to common proof in this case.  The parties' dispute centers on liability under section 7060.2, subdivision (b) of the Ellis Act (hereafter section 7060.2(b)).  Briefly described, under section 7060.2(b)(1), owners of rent-controlled accommodations who take a property off the rental market under the Ellis Act, then offer the accommodations for residential rent or lease again within two years of the withdrawal, are liable to former tenants for actual and exemplary damages.

Defendants' primary argument, which the trial court accepted, is two-fold.  First, defendants contend a tenant may only establish liability by showing that the landlord re-offered for rent or re-rented that particular tenant's previously withdrawn unit, thus requiring a unit-by-unit analysis that cannot be established with common proof.  Second, defendants argue plaintiffs must establish the accommodations were returned to the market for "residential purposes," and that also can only be determined on a unit-by-unit basis, by evaluating whether each unit was actually rented for something other than a temporary occupancy.  Defendants additionally assert plaintiffs' damages can only be established with individualized proof.

Plaintiffs counter that an offer by defendants to return any unit on a property to the residential rental market within two years of the Ellis Act withdrawal creates liability to all tenants who were evicted from that property. Plaintiffs further argue they have sufficiently alleged facts demonstrating that whether the accommodations were offered for residential purposes can be determined on a classwide basis. Plaintiffs contend they have proposed methods of calculating damages that are amenable to class treatment, or, alternatively, that they have sufficiently established they can meet class certification requirements for a classwide determination of liability, and the court could certify a liability-only class. We conclude plaintiffs have the better argument, and that they have alleged facts sufficient to withstand demurrer on the class allegations.

## III. Liability Under the Ellis Act and the Ordinance
### A. The Ellis Act

In 1985, the Legislature enacted the Ellis Act (the Act) explicitly to supersede the California Supreme Court's decision in *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97, "to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business." (§ 7060.7.) The Act provides, "No public entity . . . shall, by statute, ordinance, or regulation, or by administrative action implementing any statute, ordinance or regulation, compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease . . . ." (§ 7060, subd. (a).) The Act defines "[a]ccommodations" as "residential rental units in any detached physical structure containing four or more residential rental units" (§ 7060, subd. (b)(1)(A)) or, "[w]ith respect to a detached physical

9

structure containing three or fewer residential rental units, the residential rental units in that structure and in any other structure located on the same parcel of land, including any detached physical structure . . . ." (§ 7060, subd. (b)(1)(B).)

The Act "preempt[s] any local ordinance that prohibited a landlord from removing its rental units from the marketplace." (*San Francisco Apartment Assn. v. City and County of San Francisco* (2016) 3 Cal.App.5th 463, 477, citing § 7060.7.) It also " ' "completely occupies the field of substantive eviction controls over landlords who wish to withdraw" all units from the residential rental market.' [Citations.]" (*Id.* at p. 478.)

Although landlords may "go out of business," the Act does not "[p]ermit an owner to . . . [¶] [w]ithdraw from rent or lease less than all of the accommodations, as defined by paragraph (1) or (2) of subdivision (b) of Section 7060." (§ 7060.7, subd. (d)(1).)[4] Further, a landlord who re-enters the residential rental market after withdrawing accommodations is subject to liability to former tenants and must also comply with statutory restrictions.

Section 7060.2 governs re-rental of previously rent controlled properties.[5] The Act's re-rental, or "recontrol

---

[4]     The Ordinance, like the Ellis Act in section 7060.7, subdivision (d)(1), requires the withdrawal of *all* of a property's units from the rental market. (LAMC, § 151.09, subd. (A)(10).)

[5]     Section 7060.2 of the Act permits statutes, ordinances, or regulations that enact the section's provisions. The Ordinance accordingly includes these provisions. As the Ordinance explicitly incorporates the Ellis Act, our analysis focuses on the Act. (LAMC, § 151.22 ["It is the purpose of this section, and

10

provisions [are] designed to thwart efforts by landlords to circumvent rent control by evicting tenants under the false pretense that they intend to go out of the rental business, and then re-leas[e] their property at market rental rates." (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 18; accord *City of Santa Monica v. Yarmark* (1988) 203 Cal.App.3d 153, 168 ["Concerned about the possible adverse effect on rent control ordinances, the Legislature included provisions to insure against the removal of rental units for the sole purpose of circumventing rent control ordinances by, e.g., subjecting withdrawn accommodations to rent control if offered again for residential purposes. (Gov. Code, § 7060.2.)"].)

The property owner's return of accommodations to the residential rental market within two years of withdrawal exposes the owner to the greatest penalties and restrictions: actual and exemplary damages, a right of first refusal for displaced tenants, and the owner is restricted to charging only the lawful rent in effect at the time of the notice of intent to withdraw, plus permitted annual adjustments.[6] (§ 7060.2, subds. (a), (b); LAMC, §§ 151.25, 151.27, subd. (A).) Any action by a tenant or lessee for actual and exemplary damages must be brought within three years. (§ 7060.2(b)(1); LAMC, § 151.25, subd. (A).)

---

Sections 151.23 through 151.28, to implement provisions of the Ellis Act"].)

[6] Under section 7060.2(b)(2), a public entity may also "institute a civil proceeding against any owner who has again offered accommodations for rent or lease subject to this subdivision, for exemplary damages for displacement of tenants or lessees." (§ 7060.2(b)(2).)

After two years, but within five years of the withdrawal or filing of a notice of intent to withdraw, the owner is no longer subject to actual and exemplary damages to any displaced tenant, but remains restricted to charging only the prior lawful rent plus adjustments.  (§ 7060.2, subd. (a); LAMC, § 151.26, subd. (A).)  The owner must also provide displaced former tenants a right of first refusal and is subject to limited punitive damages for failure to comply with the right of first refusal provisions.  (§ 7060.2, subd. (c); LAMC, § 151.27, subd. (B).)

After five years, but within 10 years, the owner is no longer restricted to charging only the prior lawful rent, but still must provide former tenants a right of first refusal, and remains subject to limited punitive damages for failure to comply with the right of first refusal provisions.  (§ 7060.2, subd. (c); LAMC, § 151.27, subd. (B); *Drouet v. Superior Court* (2003) 31 Cal.4th 583, 590; *City of West Hollywood v. Kihagi* (2017) 16 Cal.App.5th 739, 744 (*Kihagi*).)

Plaintiffs assert claims under LAMC section 151.25, subdivision (A), which incorporates section 7060.2(b)(1), the two-year provision entitling displaced tenants or lessees to actual and exemplary damages.  Plaintiffs contend that under this provision, a property owner who offers even one unit in the formerly withdrawn property for residential rent or lease becomes liable to all former tenants who were displaced by the Ellis Act eviction.  Defendants assert a property owner is only liable on a unit-by-unit basis, thus a former tenant may only recover under section 7060.2(b)(1) by establishing the property owner has returned that particular tenant's former unit to the residential rental market.  We turn to the statute to resolve this issue.

12

**B. Principles of statutory interpretation**

When interpreting a statute, our "core task . . . is to determine and give effect to the Legislature's underlying purpose in enacting the statutes at issue." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227 (*McHugh*); accord *Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381 (*Jarman*).) "We first consider the words of the statutes, as statutory language is generally the most reliable indicator of legislation's intended purpose. [Citation.]" (*McHugh*, at p. 227.) "We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme. [Citation.]" (*Ibid.*) " 'We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.' " (*Jarman*, at p. 381.) " 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]" (*Ibid.*; accord *McHugh*, at p. 227.)

**C. A landlord is liable under section 7060.2(b)(1) to all displaced tenants if any unit within the building is re-rented for residential purposes within two years**

We begin our analysis with the plain text of section 7060.2(b)(1), which provides, "(b) If the accommodations are offered again for rent or lease for residential purposes within two years of the date the accommodations were withdrawn from rent or lease, the following provisions shall govern: (1) The owner of the accommodations shall be liable to any tenant or lessee who

13

was displaced from the property by that action for actual and exemplary damages."  (See also LAMC, § 151.25.)

The ordinary meaning of the phrase "any tenant or lessee who was displaced from the property by that action" encompasses *any* tenant displaced from the property by the action of withdrawing the property from the rental market. (§ 7060.2(b)(1).)  Defendants agree that " 'by that action' " refers to the action of withdrawing the accommodations from the rental market.  However, they assert that a landlord is only liable for damages to the tenants who "were displaced as a result of re-rental of 'the accommodations' that were withdrawn."  The statutory language does not support this reading.  A tenant is displaced from a property by the withdrawal of the property from the market under the Ellis Act, not by the subsequent re-rental of the vacant unit.

Moreover, the singular word "property" in the phrase "[t]he owner of the accommodations shall be liable to any tenant or lessee who was *displaced from the property*," refers to the entire building or structure, not an individual tenant's unit. (§ 7060.2(b)(1), italics added.)  Indeed, the Legislature's use of the word "unit" in section 7060.2(b)(3), and elsewhere in section 7060.2, indicates the contrasting use of the word "property" in subdivision (b)(1) must be read more broadly than an individual unit.  (*McHugh*, *supra*, 12 Cal.5th at p. 227 [we must consider the "ordinary meaning of the relevant terms" together with the "terms used in other parts of the statute"].)  For example, under section 7060.2(b)(3), "[a]ny owner who offers accommodations again for rent or lease shall first offer *the unit for rent or lease* to the tenant or lessee *displaced from that unit* by the withdrawal pursuant to this chapter . . . ."  (Italics added.)  Section

14

7060.2(b)(1) has no similar language connecting or limiting the availability of damages to the displacement from or re-rental of a specific unit.

Defendants' claim that a landlord is liable only to the tenant whose unit was offered for re-rental would lead to results at odds with the Act as a whole.  Under defendants' reading of section 7060.2(b)(1), if a landlord conducted an Ellis Act eviction in a four-unit building, then offered only one of the units for re-rental, only that tenant whose unit was offered for re-rental would be entitled to actual and exemplary damages.  The other three tenants, who were similarly injured by the initial Ellis Act eviction and the landlord's failure to truly "go out of business," would be unable to seek compensation.  We do not assume that the Legislature would intend such an arbitrary distribution of damages for the same injury.  (*In re Greg F.* (2012) 55 Cal.4th 393, 406 [" 'We must also avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend' "]; *Cameron v. Las Orchidias Properties, LLC* (2022) 82 Cal.App.5th 481, 508.)

Our reading of the Act is further supported by considering section 7060.2(b)(1) and section 7060.7 together.  Section 7060.7 applies to the entire Act.  (§ 7060.7 [discussing the "intent of the Legislature in enacting this chapter"].)  The section explicitly states the Act does not permit a landlord who is exiting the rental market to withdraw "less than all of the accommodations."  (§ 7060.7, subd. (d)(1).)[7]  Defendants' interpretation of section

[7]     The Ordinance's prohibitions set forth in LAMC section 151.09, subdivision (A)(10) are thus consistent with the Act.  A landlord may evict a tenant in a rental unit subject to the

15

7060.2(b)(1) would permit a landlord who withdrew all accommodations from the rental market to subsequently— perhaps even immediately—re-rent a single unit on the property, yet limit its liability for failing to actually exit the rental market to the single tenant whose unit was re-rented. This would render the requirement that an owner withdraw all accommodations from the rental market meaningless, or at least ineffective, because it leaves the other tenants without recourse. Defendants argue the Act's requirement that a property owner withdraw all rental units in a building from the market is "inapposite," but we "do not examine [particular statutory] language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment." (*Jarman*, *supra*, 10 Cal.5th at p. 381.)

Defendants further assert that because section 7060.7, subdivision (d)(1), requires the withdrawal of all units from the rental market, but the Act lacks a similar provision requiring the re-rental of all units, we should view this as an indication that the Legislature did not intend that an offer to re-rent any unit in a building renders the landlord liable to all tenants evicted from the building. We reject this argument for the reasons explained above, and also in light of the Legislature's express statement of

---

Ordinance "a. to demolish the rental unit; or [¶] b. to remove the rental unit permanently from rental housing use. . . . [¶] This subdivision constitutes lawful grounds for eviction only where a landlord is withdrawing from rent or lease all of the rental units in a structure or building. A landlord seeking to evict tenants pursuant to either of the circumstances described in this subdivision may not withdraw from rent or lease less than all of the accommodations in a structure or building."

16

the scope of the Act as set forth in section 7060.7, subdivision (d)(2).

Assembly Bill No. 1399 (2019–2020 Reg. Sess.) (Assembly Bill 1399) added section 7060.7, subdivision (d)(2) to section 7060.7 of the Ellis Act.  The provision states the Act does not "[p]ermit an owner to . . . [¶] . . . [¶] [d]ecline to make a written rerental offer to any tenant or lessee who occupied a unit at the time when the owner gave the public entity notice of its intent to withdraw the accommodations, in the manner and within the timeframe specified in paragraph (3) of subdivision (b) . . . of [s]ection 7060.2." (§ 7060.7, subd. (d)(2).)

According to the Legislative Counsel's Digest, Assembly Bill 1399 added this subsection to the Ellis Act's statement of legislative intent "to specify that [the Act] is not intended to permit an owner to return to the rental market less than all of the accommodations . . . ."[8] (Legis. Counsel's Dig., Assem. Bill. No. 1399 (2019–2020 Reg. Sess.) Stats. 2019, ch. 596.)  This and other changes to the Ellis Act in Assembly Bill 1399 were motivated by concerns that "landlords have been taking advantage of an ambiguity in the Act by removing, and reintroducing, units in a piecemeal fashion in order to avoid the Act's restrictions and evade rent control laws." (Assem. Com. on

---

[8]  "Even when the plain language of the statute makes reference to extrinsic materials unnecessary, a reviewing court may consult a legislative history for material that confirms the court's construction of statutory language. [Citations.]  And, '[t]o determine the purpose of legislation, a court may consult contemporary legislative committee analyses of that legislation, which are subject to judicial notice.' [Citation.]" *People v. Johnson* (2015) 234 Cal.App.4th 1432, 1443, fn. 5, citing *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 316.)

17

Judiciary, Analysis of Assem. Bill No. 1399) (2019–2020 Reg. Sess.) as amended April 25, 2019, p. 1.) A Senate Rules Committee report described the purpose of the Assembly Bill 1399 amendments as, among other things, to clarify that "once any unit is returned to the rental market, the entire property is considered back on the rental market for purposes of the Act." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1399 (2019–2020 Reg. Sess.) as amended July 11, 2019, p. 4.)

Section 7060.7, subdivision (d)(2) specifically concerns the right of first refusal provisions under section 7060.2(b)(3), which are not directly at issue in this case. However, the statement of legislative intent remains instructive and supports our reading of what the plain text of section 7060.2(b)(1) requires. If the return of any unit to the rental market renders the entire property back on the rental market, it follows that the return of any unit allows any displaced tenant to seek relief under section 7060.2(b)(1).

The statute's plain text, as incorporated by the Ordinance, indicates that to lawfully evict tenants in rent controlled units, a property owner must withdraw all of the accommodations in a property from the rental market. Returning any previously withdrawn unit to the rental market is an indication that the landlord has not, in fact, "gone out of business." Once any unit is returned to the rental market within two years, the landlord is liable to any tenant evicted when the entire property was removed from the market. The landlord cannot return individual units in a piecemeal fashion, paying damages under section 7060.2(b)(1) to each tenant only when it re-rents, or offers to re-rent, that tenant's former unit.

18

**D. Neither section 7060.2, subdivision (c), nor *Kihagi* governs the interpretation of 7060.2(b)(1)**

Defendants argue that section 7060.2, subdivision (c), which applies to re-rental within 10 years, contains similar, if not broader language than 7060.2(b)(1). Under section 7060.2, subdivision (c), "an owner who offers accommodations again for rent or lease within a period not exceeding 10 years from the date on which they are withdrawn, and which are subject to this subdivision, shall first offer the unit to the tenant or lessee displaced from that unit by the withdrawal . . . . The owner of the accommodations shall be liable to any tenant or lessee who was displaced by that action for failure to comply with this paragraph, for punitive damages in an amount which does not exceed the contract rent for six months, and the payment of which shall not be construed to extinguish the owner's obligation to comply with this subdivision." (See LAMC, § 151.27, subd. (B).) Defendants contend section 7060.2, subdivision (c) clearly provides for unit-by-unit liability only, so section 7060.2(b)(1) must as well.

We reject defendants' argument. Section 7060.2, subdivision (c) is neither at issue in this case, nor does it govern an interpretation of section 7060.2(b)(1), because the two provisions have key differences. As explained above, section 7060.2(b)(1) affords tenants displaced by an Ellis Act eviction a monetary remedy when the property owner offers the accommodations again for rent for residential purposes within two years of the withdrawal date. Section 7060.2(b)(3) governs a tenant's right of first refusal if the accommodations are returned to the rental market within two years.

In contrast, section 7060.2, subdivision (c), contains no provision for damages simply because the property owner has returned accommodations to the market within 10 years. Instead, it guarantees that former rent-control tenants may return, and it penalizes the property owner for not complying with the requirement that those former tenants be provided a right of first refusal for the units being returned to the market. This is reflected in the language of section 7060.2, subdivision (c), that the owner is liable for punitive damages "to any tenant or lessee who was displaced by that action *for failure to comply with this paragraph . . . .*" (Italics added.) We disagree that, to the extent liability under section 7060.2, subdivision (c) can only be determined on a unit-by-unit basis—an issue we need not and do not decide—the same is true under section 7060.2(b)(1).

Further, the section 7060.2, subdivision (c) 10-year provision is not before us. Plaintiffs' first cause of action is based exclusively on the Ordinance, LAMC section 151.25, which incorporates section 7060.2(b)(1) of the Ellis Act. These provisions govern liability for return of accommodations to the residential rental market within *two years*. (LAMC, § 151.25; § 7060.2(b)(1).) The complaint also expressly limits the proposed class to "former tenants of any property owned by any Defendant who were displaced from their rental units pursuant to the Ellis Act and where at least one rental unit within their buildings was offered for rent or lease *within two years* of the date of the withdrawal . . . ." (Italics added.) Although defendants assert there is "no fundamental reason" to limit the claim to two years, we are bound to evaluate plaintiffs' complaint as drafted. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1202 [at demurrer stage, plaintiff is "master" of the complaint and we

20

must accept allegations at face value].)[9]

Defendants' reliance on *Kihagi*, *supra*, 16 Cal.App.5th 739, is equally misplaced. In *Kihagi*, the city moved to enforce a settlement agreement regarding the landlord's re-rental of previously rent controlled units in an apartment building. The settlement agreement required the landlord to comply with the Ellis Act, and the city contended that by re-renting three previously occupied units, the landlord breached the agreement. (*Id.* at pp. 747, 750.) The appellate court examined whether,

---

[9] Defendants suggest in their appellate briefing that plaintiffs cannot limit their claims to section 7060.2(b)(1), but must also assert claims under section 7060.2, subdivision (c). At oral argument, counsel for defendants also asserted that plaintiffs' decision to assert claims only under section 7060.2(b)(1) may raise due process concerns. (See e.g., *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 464 [trial court abused its discretion in certifying class action because plaintiffs did not adequately represent the class in failing to "raise claims reasonably expected to be raised by the members of the class"].) However, this issue is properly addressed as whether the proposed class representatives will adequately protect the proposed class. The trial court did not address the issue of the adequacy of proposed class representatives to represent those with claims outside of the proposed two-year period in section 7060.2(b)(1), and the defendants did not raise the issue in their demurrer. Moreover, the issue may be decided at the class certification stage. (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 924–925 [rejecting as "premature" argument that plaintiffs who sought recovery for some types of damages but not others were "effectively waiving" any possibility of recovery for the other damages for the class; trial court could "certify a class without waiving the right of class members" by either limiting class to a liability class or dividing the class into subclasses, among other solutions].)

21

under the Ellis Act, the landlord had to offer the units to the previous tenants and what rental rates the landlord could now charge for those units under section 7060.2, subdivisions (a) and (c). (*Id*. at pp. 751–752.)

The *Kihagi* court did not examine the questions presented here. None of the alleged violations in *Kihagi* occurred within two years of the landlord's purported withdrawal or notice of withdrawal of accommodations from the rental market. (*Kihagi*, *supra*, 16 Cal.App.5th at p. 747.) Nor did the *Kihagi* court examine liability to all tenants under section 7060.2(b)(1). It only considered the question of whether the units needed to be offered to the previous tenants and at what rates—issues that were unit specific under the circumstances of that case and within the framework of section 7060.2, subdivision (c). (*Id*. at p. 752.) That analysis does not apply here.

Liability under LAMC section 151.25, subdivision (A) and section 7060.2(b)(1) does not require a unit-by-unit analysis. The entire property must be removed from the rental market for a property owner to permissibly go "out of business." (§ 7060.7, subd. (d)(1); LAMC, § 151.09, subd. (A)(10).) If the landlord violates this requirement by returning any of the units to the residential rental market within two years, any tenant who was displaced from the property may seek relief under LAMC section 151.25, subdivision (A) and section 7060.2(b)(1). Thus, the scope of what plaintiffs must prove is narrower than defendants claim. Plaintiffs need not establish that every unit in each of defendants' buildings was returned to the rental market, or that the specific units each putative class member occupied were the units defendants offered for residential re-rental. Instead, common proof may be used to determine whether any

units in each of defendants' withdrawn buildings were returned to the residential rental market.

## IV. Plaintiffs Have Alleged Facts Demonstrating a Reasonable Possibility They Can Establish Common Issues Predominate

Defendants also argue that section 7060.2(b)(1) only creates owner liability for residential re-rentals. We agree. The plain text states that "[i]f the accommodations are offered again for rent or lease for *residential purposes*," there is liability for damages. (§ 7060.2(b), italics added.) However, we disagree that whether defendants' re-rental offers were for "residential purposes" is a question that cannot be resolved with common proof. Plaintiffs have sufficiently alleged facts showing a common scheme of residential re-rental offers for defendants' properties. If plaintiffs ultimately establish at class certification that defendants' re-rental offers are sufficiently similar and contain common indicia of a residential rental offer, as alleged, liability under the Ordinance and the Ellis Act can be determined on a classwide basis.

The Ellis Act does not define "residential purposes." However, the term "residence" was discussed in *Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072. In *Bullock*, the court reasoned that the term "residential" in the context of the Act, "at the very least demonstrates an emphasis on habitations not of a temporary nature." (*Id*. at p. 1097.) The trial court here also recognized that other Government Code provisions state that in "determining the place of residence the following rules shall be observed: [¶] (a) [i]t is the place where one remains when not called elsewhere for labor or other special temporary purpose . . . . [¶] (b) There can only be one residence.

23

[¶] (c) A residence cannot be lost until another is gained."**10** (§ 244.)

The determination of whether defendants' accommodations were offered for "residential purposes" may thus involve multiple factors. However, the question before us is whether, "assuming the truth of the factual allegations in the complaint, there is no reasonable possibility" the trial court could determine that the offers were for "residential purposes" on a classwide basis. (*Bridgeford*, *supra*, 202 Cal.App.4th at pp. 1041–1042; *Schermer*, *supra*, 245 Cal.App.4th at p. 925.) Only then would dismissal of the class allegations on demurrer be warranted.

Plaintiffs have alleged facts sufficient to demonstrate there is a reasonable possibility that liability can be determined by facts common to all class members. (*Bridgeford*, *supra*, 202 Cal.App.4th at pp. 1041–1042.) The statute applies to "accommodations . . . *offered* again for rent or lease for residential purposes." (§ 7060.2(b), italics added.) Plaintiffs have sufficiently alleged a common *offer* to rent for residential purposes, pleading that "Defendants used Airbnb to offer to re-rent withdrawn accommodations for periods of 30 days or more." Plaintiffs also allege that the offers were not significantly different, asserting "[v]irtually all the Airbnb listings posted by Defendants had a maximum stay of 1,125 nights." While not determinative, the allegation that defendants offered "virtually all" listed units for stays of over three years, if true, could be one significant indication that the proposed occupancies were not

---

**10**    We need not and do not decide whether the section 244 rules are appropriately applied to define "residential" under the Act.

transitory.  Plaintiffs also allege that at least some of the Airbnb listings offered monthly rental rates.

While we do not consider contentions or conclusions in a complaint (*Aubry*, *supra*, 2 Cal.4th at p. 967), plaintiffs have alleged facts supporting a common policy of residential offers sufficient to survive a demurrer.  That one unit was re-rented, and one was not, or that one unit was rented on a temporary basis and one for residential purposes, does not determine whether liability can be established on a classwide basis.  As discussed above, plaintiffs do not need to show that all units in each building were returned to the residential rental market to establish liability.  Further, liability turns on the defendants' offers to create residential tenancies, not on whether they were ultimately successful in obtaining residential tenants. (§ 7060.2(b) ["If the accommodations are *offered* again for rent or lease for residential purposes within two years . . . ."  (Italics added.)]; see *Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 815 [in retaliatory eviction case landlord entitled to possession only if he could prove he had a "bona fide intent to withdraw the Property in its entirety"].)  Thus, plaintiffs only need to establish that there was one *offer* for residential purposes for each building, or that at least one unit in each building was actually re-rented for residential purposes, to create liability to all tenants in that building under section 7060.2(b)(1).  That the plaintiffs may need to look at the circumstances surrounding the rental of an individual unit, or several individual units, to find a unit offered for residential purposes does not mean that common issues cannot predominate if there is a common policy.

The primary legal question in this case will be whether defendants' practice of offering previously withdrawn

25

accommodations for rent on Airbnb constitutes re-rental for residential purposes under the Act.  If, as they have alleged, plaintiffs show at class certification that defendants' offers and conduct in placing the units back on the market were sufficiently similar across rental units, the relevant issues of law and fact will be susceptible to common proof and liability can be determined on a classwide basis.  We cannot conclude at this preliminary stage of the litigation that as a matter of law plaintiffs will not be able to establish liability with common proof. (*Tucker*, *supra*, 208 Cal.App.4th at p. 230.)

Defendants assert that even if liability under section 7060.2(b)(1) does not mandate a unit-by-unit analysis, it must be assessed building-by-building, so the central issue is still not amenable to class treatment.  We agree that only former tenants who lived in buildings with at least one residential re-rental offer would be eligible for relief.  A building that was taken off the market and never offered for re-rental does not fall under the ambit of section 7060.2(b)(1).

However, that potential class members would have to establish *eligibility* for class relief by showing there was an offer to rent a unit in their building does not mean that common questions do not predominate.  (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 (*Sav-On Drug Stores*); *Nicodemus v. Saint Francis Memorial Hospital* (2016) 3 Cal.App.5th 1200, 1218–1219 (*Nicodemus*); *Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 99–100.)  Courts have consistently held that common issues may predominate even when each class member will have to establish that he or she is eligible.  (*Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 397.)

For example, in *Nicodemus*, *supra*, 3 Cal.App.5th 1200, the plaintiff alleged the defendants had a practice of overcharging patients for copies of their medical records. (*Id*. at p. 1205.) The court found the "common question" was the application of a statute to the defendant's "uniform practices in response to attorney requests for medical records. The fact that each class member ultimately may be required to establish his or her records request was submitted before or in contemplation of litigation does not overwhelm the common question regarding those uniform copying practices." (*Id*. at p. 1219; *Franchise Tax Bd. Limited Liability Corp. Tax Refund Cases* (2018) 25 Cal.App.5th 369, 394 [theory of recovery was that statute was unconstitutional; question was "manifestly a legal question common to all proposed class members that is highly amenable to class action treatment," even though only those who paid the levy would be eligible].)

Likewise, in *Sav-On Drug Stores*, *supra*, 34 Cal.4th 319, our Supreme Court concluded common issues predominated where plaintiffs, store managers at various Sav-On Drug Stores, sought unpaid overtime compensation based on a common policy that allegedly improperly exempted the managers from overtime laws. The court recognized that the defendant was "entitled to defend against plaintiffs' complaint by attempting to demonstrate wide variations in the types of stores and, consequently, in the types of activities and amounts of time per workweek the [two types of managers] in those stores spent on different types of activities. Nevertheless, a reasonable court crediting plaintiffs' evidence could conclude it raises substantial issues as to both whether a misclassification policy existed and whether, in any

27

event, a uniform classification policy was put into practice under the standardized conditions alleged." (*Id.* at p. 330.)

Similarly, here, that a tenant will have to show that at least one unit in the tenant's building was offered for residential rental to demonstrate eligibility, or that defendants may defend on the basis that some buildings lacked any re-rental offers, does not establish that common questions as to liability do not predominate.

Defendants rely on two cases in support of their argument that plaintiffs cannot show common questions predominate. Both are distinguishable from this case. In *Schermer*, *supra*, 245 Cal.App.4th 912, the plaintiffs sought to represent a class in a case involving 18 mobile home parks operated by the defendants. (*Id.* at p. 915.) The plaintiffs alleged the defendants subjected them to unconscionable lease agreements and leasing practices. The trial court sustained the defendants' demurrer and the Court of Appeal affirmed, holding that individual issues predominated. (*Id.* at pp. 925–926.) The alleged unconscionable policies and procedures were based on one-on-one interactions between different defendants and plaintiffs in each of the 18 mobile home parks. The allegations involved improper conduct in the negotiation, execution, and enforcement of each lease agreement. There were at least eight different leasing practices. There were 16 cities involved, with at least eight different applicable rent control ordinances. (*Id.* at pp. 926–927.)

In contrast, here the question is whether defendants' common online offer to re-rent was an offer to create a residential occupancy. Defendants may be held liable to any displaced tenant in a building where there was such an offer. All of defendants' buildings are alleged to be in one city, subject to the

28

same rent control ordinance.  While plaintiffs will need to prove and substantiate their allegations of a common unlawful re-rental practice, it is undisputed that defendants' conduct directed at the plaintiffs was uniform; plaintiffs' claims do not depend on defendants' individualized interactions with each putative class member, as was the case in *Schermer*.

In *Newell*, *supra*, 118 Cal.App.4th 1094, the plaintiffs were insured homeowners at the time of the Northridge earthquake. The Court of Appeal affirmed the trial court's order sustaining a demurrer and dismissing class allegations, finding that common questions of law and fact did not predominate.  Plaintiffs alleged a "pervasive scheme" by the defendant insurance companies that caused the insurers to improperly limit liability on the plaintiffs' earthquake claims.  (*Id.* at p. 1103.)  The *Newell* court held that even if the insurance companies had "adopted improper claims practices to adjust Northridge earthquake claims, each putative class member still could recover for breach of contract and bad faith *only* by proving his or her individual claim was wrongfully denied, in whole or in part, and the insurer's action in doing so was unreasonable.  [Citation.]  Thus, each putative class member's potential recovery would involve an individual assessment of his or her property, the damage sustained and the actual claims practices employed.  [Citation.]  In such cases, class treatment is unwarranted." (*Ibid*.)  Here, in contrast, each putative class member's claim rests on whether the alleged similar offers to re-rent were "residential" offers, which is a common question capable of classwide resolution.

When reviewing the evidence at class certification, the trial court may ultimately determine that there is insufficient evidence to show defendants engaged in a common course of

29

conduct that can be evaluated on a classwide basis to determine if the re-rental offers were for residential purposes.  Defendants may also ultimately defend against liability by arguing that there were no re-rental offers for particular buildings.  However, we cannot conclude as a matter of law that there is no reasonable possibility that common questions as to liability for the Ordinance and Ellis Act claim will predominate.

## V.     The Trial Court Erred in Concluding Common Issues Did Not Predominate as to Plaintiffs' Other Causes of Action

Defendants have argued plaintiffs' fraud and Unfair Competition Law claims depend on alleged misrepresentations and violations of the LAMC, thus plaintiffs' inability to show they will satisfy class certification requirements as to the Ellis Act and Ordinance claim is equally true for the remaining causes of action.  The trial court similarly concluded that its analysis of the Ordinance and Ellis Act class claim applied equally to plaintiffs' class claims for fraud and violations of the Unfair Competition Law.  For the reasons discussed above, we disagree.  Plaintiffs have alleged sufficient facts to show questions of law and fact common to the class as to their fraud and Unfair Competition Law claims.[11]

---

[11]     We note that while the trial court sustained the demurrer to the first amended complaint with leave to amend as to the fraud claims, in ruling on the demurrer to the second amended complaint, the subsequent court found plaintiffs had "cured the defects in the [first amended complaint] as to their fraud case of action."  The court thus sustained the demurrer as to the fraud cause of action based on its conclusion that "whether Defendants' representations were false as to each unit depends on whether Defendants' re-rentals of each unit in fact violated the Ellis Act."

## VI. The Need for Individualized Proof of Damages Does Not Warrant Foreclosing Class Treatment at this Stage of the Litigation

Plaintiffs also argue the trial court erred in finding no reasonable probability they could establish common issues predominate as to damages. In the alternative, they assert the trial court should have allowed a liability-only class to go forward even if individualized issues prevent classwide determination of damages. Defendants contend determining damages will require substantial individualized proof and expert testimony unique to each plaintiff, rendering class treatment inappropriate. We conclude that even if class members ultimately need to individually establish damages, plaintiffs have still alleged facts sufficient to withstand the demurrer to their class allegations.

Section 7060.2(b)(1) provides for actual and exemplary damages. The Ellis Act does not define "actual" damages. (§ 7060(b)(1)–(2).) Yet, cases involving the calculation of actual damages due to wrongful evictions under similar ordinances are instructive. In *DeLisi v. Lam* (2019) 39 Cal.App.5th 663 (*DeLisi*), the court considered damages for unlawful evictions under San Francisco's rent control ordinance, including the parties' arguments regarding the calculation of "actual damages," a term not defined in the ordinance. The *DeLisi* court concluded actual damages are not limited to out-of-pocket expenses. (*Id.* at p. 681.) Instead, the court reasoned " ' "[d]amages" are monetary compensation for loss or harm suffered by a person, or certain to be suffered in the future, as the result of the unlawful act or omission of another. ([Civ. Code,] §§ 3281–3283.) "Actual" is defined as "existing in fact or reality," as contrasted with "potential" or "hypothetical," and as distinguished from

31

"apparent" or "nominal." (Webster's Third New Internat. Dict. (1964) p. 22.) It follows that "actual damages" are those which compensate someone for the harm from which he or she has been proven to currently suffer or from which the evidence shows he or she is certain to suffer in the future. . . . In short, " ' "[a]ctual damages" is a term synonymous with compensatory damages . . . .' " [Citation.]' [Citation.]" (*DeLisi*, at p. 681.)

Here, plaintiffs' expert, Dr. Richard J. Devine, proposes two methods for assessing damages. Both require a calculation of the "rent differential," which is the difference between the actual rent at the time of a tenant's eviction and the "market rent" for a "comparable unit" at the time of the tenant's displacement. Plaintiffs allege a "comparable unit" is a unit with the same number of bedrooms and bathrooms as a tenant's former unit, located "as close as possible" to the original unit. Plaintiffs assert that calculating the rent differential does not require individualized inquiries because the original rent amounts will be located in data in defendants' possession and the market rents are obtained from public sources that report comparable rent information, such as Zillow and Apartments.com.

After determining the rent differential, plaintiffs assert actual damages may be calculated to a "reasonably certain" degree. One method involves using a "capitalization rate," which is a published percentage that is regularly reported for a certain market (i.e., the Los Angeles real estate market) that reflects an estimate of the potential return on a real estate investment. The rent at the time of displacement of the tenant is then compared to the market rent, annualized, and "capitalized" at this set percentage.

Plaintiffs' second proposed method for calculating damages is to compare the rent at the time of displacement with the market rent, annualized by the expected duration of the tenancy and projected yearly increases to the rent. According to the complaint, average tenures differ in units subject to the Ordinance. Thirty percent of rent controlled units in Los Angeles have tenures of 10 years or longer, but in some "sections of the city, such as West, Central, and East Los Angeles," 37 percent of tenants stay 10 years or longer. A factor in the consideration of the projected length of tenancy is how long the tenant lived in the unit prior to displacement. Plaintiffs argue this information can also be obtained from data within defendants' possession.

Several wrongful eviction cases have considered Devine's rent differential method of calculating damages. *Chacon v. Litke* (2010) 181 Cal.App.4th 1234 (*Chacon*), concerned the wrongful eviction of a family under the San Francisco Rent Stabilization and Arbitration Ordinance. Devine testified as an expert regarding the plaintiffs' damages. (*Id*. at p. 1245.) He calculated the difference between the Chacons' rent when they were evicted and the "market rent" for a similar apartment, over an estimated 20-year tenancy. (*Ibid*.) The mother testified that she had intended to live at the apartment for the rest of her life, which was a consideration in calculating the length of the tenancy if the family had not been evicted. (*Ibid*.) The court awarded damages to the mother and father, but not the Chacons' adult children, who did not pay rent. The court also awarded different amounts of emotional distress damages to various individuals who had resided in the apartment. (*Id*. at p. 1246.)

In *Duncan v. Kihagi* (2021) 68 Cal.App.5th 519, Devine testified as to the amount the tenants were paying when

displaced and the market rate for a similar unit, calculated over an estimated 20 years that the tenants would have stayed in the apartment. (*Id*. at p. 544.) Devine specifically opined, based on an interview with the tenants, how long they would have stayed in the unit. Although the defendants argued on appeal that Devine was not qualified to opine on how long the tenants would have stayed in their units, the court reasoned that the duration of tenancy was ultimately a jury question. (*Id*. at pp. 544, 547.)

In *DeLisi*, Devine "based his opinion of fair market value on data from a real estate reporting service that surveys rental rates in San Francisco and his own experience in real estate finance and development, considering size, location, and amenities." (*DeLisi*, *supra*, 39 Cal.App.5th at p. 679.) Devine "had not been inside the Balboa units but had seen photographs and discussed the units with the tenants." (*Ibid*.) From this information he determined the fair market value of comparable units. (*Ibid*.)

As alleged by plaintiffs in their complaint, and illustrated by cases concerning actual damages for wrongful evictions, plaintiffs' proposed methods of calculating damages rest in part on a determination of the fair market value of each unit. Fair market value is based on a comparison of the displaced tenant's unit with a similar unit on the rental market, which is in turn based on number of bedrooms, number of bathrooms, and location. Also relevant are the amenities in the unit. (*DeLisi*, *supra*, 39 Cal.App.5th at p. 679.) Further, the proposed second method of calculating actual damages requires an estimate of how long each tenant would have stayed in the unit, which, even if not established through individual testimony (*Chacon*, *supra*, 181 Cal.App.4th at p. 1245), would necessitate an analysis of records specific to individual tenants. Plaintiffs have not alleged

34

that all proposed class members paid the same amount of rent, or that they occupied units that would likely have the same fair market value.  Plaintiffs also have not alleged that the buildings and units are sufficiently similar such that the fair market value of each can be determined without answering these individualized questions.

Nonetheless, our high court has "recognized that the need for individualized proof of damages is not per se an obstacle to class treatment [citation] and 'that each member of the class must prove his separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper[.]' [Citation.]" (*Sav-On Drug Stores*, *supra*, 34 Cal.4th at pp. 334–335.)  Further, "[p]redominance is a comparative concept, and 'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate.' [Citations.]  Individual issues do not render class certification inappropriate so long as such issues may effectively be managed." (*Id*. at p. 334.)

While plaintiffs' proposed methods of calculating damages appear to inevitably require some individual unit- or tenant-specific proof, plaintiffs have still alleged facts which, if true, suggest the individual issues may effectively be managed.  For example, plaintiffs allege factors such as length of tenancy, the actual rent tenants were paying, and market rates for comparable units may be determined either from data in defendants' possession or publicly available sources.  Defendants contend they will have the right to advance other theories of damages that would require additional individualized proof, yet "[d]efenses that raise individual questions about the calculation

of *damages* generally do not defeat certification." (*Duran*, *supra*, 59 Cal.4th at p. 30.)

This case thus differs from *Schermer*, in which the appellate court held that, independent of the lack of common proof for liability issues, the demurrer to class allegations was properly sustained due to the substantial and numerous factually unique questions necessary to determine each plaintiff and putative class member's damages. (*Schermer*, *supra*, 245 Cal.App.4th at pp. 926–927.) As noted above, the allegations in *Schermer* involved multiple mobile home parks, in different cities with separate rent control ordinances, and multiple time periods. (*Id*. at p. 927.) Here, while there are several properties at issue, they are alleged to all be in the same city, and plaintiffs have alleged facts which, while they do not eliminate the need for individualized questions to be answered with respect to damages, offer proposals for the management of those questions. And, in contrast to *Schermer*, we have already concluded that plaintiffs have alleged facts sufficient to establish that the central issues of law and fact necessary for the determination of liability can be established with common proof.

"[C]lass treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" ' on common issues." (*Duran*, *supra*, 59 Cal.4th at p. 28.) But we are mindful that this case is before us on appeal from a trial court order sustaining a demurrer. Although determining damages would necessitate at least some individual proof, there remains a reasonable possibility that plaintiffs will still be able to satisfy the requirements for class certification.

## VII. Plaintiffs Have Alleged a Substantial Benefit to Class Resolution of Liability

"The party advocating class treatment must demonstrate . . . substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1021.) A class should not be certified unless " ' "substantial benefits accrue both to litigants and the courts." ' [Citations.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.) In considering whether a class action would be superior, courts consider four main factors: the interest of each member in controlling his or her own case personally, the difficulties in managing a class action, the nature and extent of individual litigation already in progress involving the same controversy, and the desirability of consolidating all claims before the same court. (*Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1353; *Basurco v. 21st Century Ins. Co.* (2003) 108 Cal.App.4th 110, 121 (*Basurco*).)

Plaintiffs have sufficiently alleged that classwide resolution of their liability claims has substantial benefits over individual actions. First, Plaintiffs do not have a particular need to control their own cases as to liability. This is not a case where they seek specific repairs to their own homes, for example. (Cf. *Basurco*, *supra*, 108 Cal.App.4th at p. 121.) Even where individualized issues predominate as to damages, a court may still certify a liability class and then allow class members to establish damages individually in a second damages phase of trial. (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 941 [" ' "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages" ' "]; *Sav-*

*On Drug Stores*, *supra*, 34 Cal.4th at p. 332 ["That calculation of individual damages may at some point be required does not foreclose the possibility of taking common evidence on the misclassification questions"].)

Second, we have already concluded that at this stage of the litigation, plaintiffs have adequately pled that their first three causes of action are capable of common resolution as to liability.

Third, there is some litigation by individual class members already, as evidenced by two complaints in the record. However, plaintiffs allege that there are at least 35 buildings at issue in this case, and the two other complaints in the record are filed on behalf of a total of seven plaintiffs. This does not render the separate litigation so substantial that it will necessarily be difficult for the courts to coordinate already outstanding cases. (Cf. *Basurco*, *supra*, 108 Cal.App.4th at p. 122 [refusing to certify class because it "would undermine the efforts of the superior court to manage the hundreds of other similar cases"].)

Finally, it is desirable to consolidate all of the potential actions by the tenants before the same court because they are based on an alleged common practice. It is more efficient for the court to determine liability for an alleged common scheme than for each tenant in each building. The class is alleged to be "hundreds of members," so individual cases would be burdensome for the courts. We also must consider that "when potential recovery to the individual is small and when substantial time and expense would be consumed in distribution, the purported class member is unlikely to receive any appreciable benefit." (*Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 386.) Here, the potential recovery of each class member is not alleged to be small. Plaintiffs allege the aggregate damages are "in the

millions of dollars," so each class member is likely to come forward.  While the evidence at the class certification stage of litigation may ultimately show otherwise, we cannot determine as a matter of law, as we must when reviewing an order sustaining a demurrer, that class resolution is not a superior method of litigating plaintiffs' first three causes of action. (*Bridgeford*, *supra*, 202 Cal.App.4th at p. 1042.)

**DISPOSITION**

The order sustaining defendants' demurrer to the class allegations in the second amended complaint is reversed. On remand, the trial court shall issue an order reinstating plaintiffs' class allegations and conduct further proceedings not inconsistent with this opinion. Appellants to recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**


ADAMS, J.


We concur:



EDMON, P. J.



EGERTON, J.